20 F.3d 216
 23 UCC Rep.Serv.2d 466
 Paul P. PIPER, Jr., Plaintiff/Counter-Defendant/Appellee,
v.
Daniel P. GOODWIN; C. Eugene Goodwin; A.S. Hart,
Defendants/Counter-Plaintiffs/Appellants,
Ronald K. Moore, Counter-Defendant/Appellee.
 No. 93-5051.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 4, 1994.
Decided March 29, 1994.
Rehearing Denied May 2, 1994.
 
 J. Alan Hanover and James R. Newsom, III (argued and briefed), Hanover, Walsh, Jalenak & Blair, Memphis, TN, for plaintiff-appellee.
 Donald W. Pemberton (argued and briefed), Memphis, TN, for defendants-appellants.
 Andrew R. Carr, Jr., Shuttleworth, Smith, McNabb & Williams, Memphis, TN, for defendant-appellee.
 Before: KENNEDY and GUY, Circuit Judges; and FEIKENS, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Pursuant to Tennessee's version of the Uniform Commercial Code, the plaintiff sued three individual defendants for collection on two promissory notes. The jury found in favor of the plaintiff and the district court entered a judgment against the defendants on the notes, together with interest and attorney fees. Five issues have been raised on appeal. After reviewing these issues, we find no error and affirm.
 
 I.
 
 2
 This appeal arises out of a complex series of real estate transactions. The plaintiff, Paul Piper, Jr., brought a lawsuit to collect on two promissory notes, both of which were made by the Rivergrove Development Company, Inc. Piper came into possession of these notes by way of an assignment from Ronald K. Moore. Piper claimed that two of the defendants, C. Eugene Goodwin and Daniel P. Goodwin, were liable because they were alter egos of then-insolvent Rivergrove Development, and the other defendant, A.S. Hart, was independently liable as an endorser of one of the notes. The facts leading up to this lawsuit are set out below.
 
 
 3
 In 1978, Moore purchased a large tract of undeveloped land in suburban Memphis, Tennessee. At that time, he intended to build homes on the property for him and his friend Piper. Part of this tract was later subdivided by a partnership owned by Moore and Piper.
 
 
 4
 In June 1983, Hart approached Moore, stating that he wanted to sell lots in the subdivision but, because he did not have a brokerage license, he would have to hold the lots in his own name. Moore sold three lots to Hart, including one of the lots relevant to this case--lot 8. In return, Moore took a note from Hart in the amount of $45,000, which was secured by a first deed of trust on lot 8.
 
 
 5
 Later that month, Hart informed Moore that Eugene Goodwin wanted to purchase the remaining lots in the subdivision. Moore received from Hart a proposed contract for the purchase of these lots, which included the other lot relevant to this case--lot 9. The contract listed Goodwin Development Company, Inc. as the purchaser.
 
 
 6
 The closing occurred on July 7, 1983. With respect to lot 9, Moore took a note from Goodwin Development in the amount of $55,000, which was secured by a first deed of trust. As part of this sale, Eugene Goodwin loaned money to Goodwin Development, for which he received a second deed of trust on lot 9 in the amount of $15,000. Both Moore's and Eugene Goodwin's trust deeds contained provisions by which each agreed to subordinate their mortgages to construction loans.
 
 
 7
 Eugene Goodwin then decided that he did not want to be involved in the building of these properties, so he sold his interest in Goodwin Development to Hart. Eugene Goodwin, who still held the second deed of trust on lot 9, also began to worry about whether his second mortgage would be repaid. Adding to his fears was the fact that the subordination clause contained in this deed precluded any control he might have exercised over a third party builder.
 
 
 8
 In early January 1984, a builder was found--Eugene Goodwin's son, Daniel. According to Daniel Goodwin's testimony, he "overheard" his father and Hart talking at the Goodwin's family business office about finding a builder for the subdivision. Daniel Goodwin expressed his interest in this project and was selected. Hart also informed Daniel Goodwin that a few days earlier, Hart had filed a charter for a corporation known as Rivergrove Development Company, Inc., with the Tennessee Secretary of State. The corporation had not been used, and Hart offered to sell the corporation to Daniel Goodwin. A short time later, this sale occurred.
 
 
 9
 On January 9, 1984, Daniel and Eugene Goodwin signed two contracts of sale relating to lots 8 and 9, with Hart as seller of lot 8 and Goodwin Development as seller of lot 9.[1] Daniel and Eugene Goodwin were listed as the purchasers of both lots, and there was no reference to Rivergrove Development in either sales contract. In return, Rivergrove Development gave a $45,000 promissory note to Hart for lot 8 and a $55,000 promissory note to Goodwin Development for lot 9. These notes were then negotiated to Moore: the $45,000 note was endorsed by Hart and the $55,000 note was endorsed by Hart on behalf of Goodwin Development. These two notes replaced the notes Moore had been holding that were made by Hart and Goodwin Development.
 
 
 10
 On January 30, 1984, Rivergrove Development executed two notes payable to Eugene Goodwin in the amount of $275,000 each. These notes represented construction loans from Eugene Goodwin to Rivergrove Development. As part of this transaction, Rivergrove Development used some of the funds to pay off Eugene Goodwin's second deed of trust on lot 9. Moreover, because this was a "construction loan," the subordination clause kicked in and Moore's first mortgage on lot 9 was reduced to a second mortgage.
 
 
 11
 Between January and June 1984, there was some clearing and footings were dug on lots 8 and 9, but the work terminated, according to Daniel Goodwin's testimony, when funding stopped. Although neither Daniel Goodwin nor Rivergrove Development were in default on Eugene Goodwin's construction loan at that time, Eugene Goodwin stopped funding the project and foreclosed on lots 8 and 9. A foreclosure sale was held and Eugene Goodwin, the sole bidder, obtained title to both properties for about $90,000. Moore's second deed on lot 9 was extinguished. A short time later, Rivergrove Development was insolvent and the State of Tennessee revoked its charter.
 
 
 12
 On January 13, 1988, Moore filed a lawsuit as the holder of the notes against Eugene Goodwin, Daniel Goodwin, and Hart. This suit was filed in the Chancery Court of Shelby County, Tennessee. At this time, Moore was in financial trouble, and Piper agreed to loan him $400,000. Moore later realized that he would not be able to repay Piper, so they reached an agreement whereby Moore assigned all of his assets to Piper in repayment of the loan.[2] Both Moore and Piper testified that it was their understanding that this assignment included the two notes made by Rivergrove Development. Moore also testified that at the time of the assignment he did not have possession of the notes because they were in the court's records, but at a later date the notes were delivered to Piper through Piper's attorney.
 
 
 13
 Piper filed this lawsuit on May 18, 1989, and the suit brought in Chancery Court by Moore was dismissed. The case was tried before a jury. At the close of the proof, the district court granted Piper's motion for a judgment against Hart on the promissory note that he had endorsed. The jury returned a verdict in favor of Piper and, based on this verdict, the court found against Eugene Goodwin and Daniel Goodwin on the notes, in the amounts of $45,000 and $59,125, respectively, together with prejudgment interest and attorney fees. The defendants then appealed.
 
 II.
 A.
 
 14
 The defendants argue that Piper was not a holder of the notes when he commenced this action and, thus, he had no legal right to seek their collection. Relying on Tenn.Code Ann. Sec. 47-3-202,[3] the defendants contend that because both notes are payable to order, to be negotiated to Piper the notes had to have been delivered to him and endorsed by Moore. The defendants maintain that the evidence is questionable as to whether Moore delivered the notes to Piper and, at a minimum, it is clear that neither note was endorsed by Moore. Therefore, the defendants argue, because the notes were not negotiated to Piper, he is not a holder and cannot bring this action.
 
 
 15
 Even if we were to assume the defendants' interpretation of Sec. 47-3-202 is correct, it does not resolve this matter. The facts of this case are better analyzed under Tenn Code Ann. Sec. 47-3-201, which provides:
 
 
 16
 47-3-201. Transfer--Right to endorsement.--(1) Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has himself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his position by taking from a later holder in due course.
 
 
 17
 (2) A transfer of a security interest in an instrument vests the foregoing rights in the transferee to the extent of the interest transferred.
 
 
 18
 (3) Unless otherwise agreed any transfer for value of an instrument not then payable to bearer gives the transferee the specifically enforceable right to have the unqualified endorsement of the transferor. Negotiation takes effect only when the endorsement is made and until that time there is no presumption that the transferee is the owner.
 
 
 19
 This provision is often referred to as the "shelter rule," and in circumstances similar to the one before us, Tennessee courts, and other courts interpreting similar provisions, have held that an assignee does have the rights of the assignor, notwithstanding the absence of a proper negotiation.
 
 
 20
 In Martin v. Martin, 755 S.W.2d 793 (Tenn.Ct.App.1988), the plaintiff, an assignee of a note, brought an action against the payors for the alleged unpaid balance of the note. On appeal, the defendants argued that the assignee did not have standing to sue on this note. The court referred to Tenn.Code Ann. Sec. 47-3-201 and found that since the assignor did not have possession of the note, it could not have transferred or negotiated the note to the plaintiff. The court conceded that because of this fact, the plaintiff was not a holder of the note. Nevertheless, the court held that the plaintiff had received an assignment of a cause of action on the underlying obligation of the payors to the assignor. Thus, the court found the plaintiff could maintain this action.
 
 
 21
 The facts before us are similar to those in Martin. When Moore assigned his assets to Piper, he did not have possession of the notes because they were with the court in which he had previously filed the related lawsuit. Without possession of the notes, Moore could not transfer or negotiate them to Piper; however, as in Martin, Piper did receive an assignment of the cause of action on the underlying notes. Therefore, we find Piper can bring this claim.
 
 
 22
 Moreover, the case before us is even stronger than the one in Martin, because unlike in Martin, there is evidence that the notes themselves were transferred to Piper. We believe the assignment of Moore's assets to Piper and Moore's delivery of the notes to Piper's attorney constitutes a transfer as intended by section 47-3-201's shelter rule. See Black's Law Dictionary 1342 (5th ed. 1979) (defining transfer as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property").
 
 
 23
 In Schwegmann Bank & Trust Co. v. Falkenberg, 931 F.2d 1081 (5th Cir.1991), the court had to determine whether the plaintiff was entitled to holder in due course rights. The court concluded that, pursuant to the shelter rule, the transferee of a holder in due course acquires all the rights of the holder in due course as long as the transferee was not personally involved in any fraud or illegality, and the transferee was not a prior holder who had notice of a defense or claim against the instrument. Id. at 1083. Similarly, in American National Bank & Trust Co. v. St. Joseph Valley Bank, 180 Ind.App. 546, 389 N.E.2d 379, 383 (1979), the court observed that the shelter rule "allows a transferee a possible betterment of his own position by assuming the status of his transferor. Thus, a transferee may claim the rights of a holder if he proves that his transferor was a holder." See also Fidelity Bank, Nat'l Ass'n v. Avrutick, 740 F.Supp. 222, 235 (S.D.N.Y.1990) ("the transferee itself need not be a holder in due course in order to assert the rights of a holder in due course."); B.L. Nelson and Assoc. v. Sunbelt Sav., 733 F.Supp. 1106, 1112 (N.D.Tex.1990) ("The clear import of these cases is that assignees of the FSLIC are entitled to the protected status that the corporation itself enjoys, including holder in due course status.").
 
 
 24
 These cases are consistent with the Uniform Commercial Code's version of the shelter rule, Sec. 3-203. Comment 2 to Sec. 3-203 states that "transfer vests in the transferee any right of the transferor to enforce the instrument 'including any right as a holder in due course.' If the transferee is not a holder because the transferor did not indorse, the transferee is nevertheless a person entitled to enforce the instrument under Section 3-301 if the transferor was a holder at the time of transfer. Although the transferee is not a holder, under subsection (b) the transferee obtained the rights of the transferor as holder." More significantly, Comment 1 to Tenn.Code Ann. Sec. 47-3-201 states: "Any person who transfers an instrument transfers whatever rights he has in it. The transferee acquires those rights even though they do not amount to 'title.' "
 
 
 25
 Here, it is undisputed that Moore was a holder of the notes made by Rivergrove Development. Because he transferred these notes to Piper, Piper obtained all of the rights that Moore had as a holder. This includes the right to bring a cause of action to recover on the notes. Accordingly, we hold that Piper can bring this claim.
 
 B.
 
 26
 Hart maintains that because Moore had a first mortgage on lot 8 at the time of Hart's endorsement of the $45,000 note, Moore had an obligation to maintain his interest in this collateral. This contention rests on Tenn.Code Ann. Sec. 47-3-606, which provides:
 
 
 27
 (1) The holder discharges any party to the instrument to the extent that without such party's consent the holder:
 
 
 28
 ....
 
 
 29
 (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.
 
 
 30
 Hart asserts that because Moore failed to protect the collateral, as evidenced by the foreclosure sale which extinguished Moore's interest in lot 8, Hart was discharged from his obligation. We disagree.
 
 
 31
 In Bank of Ripley v. Sadler, 671 S.W.2d 454, 457 (Tenn.1984), the court interpreted Tenn.Code Ann. Sec. 47-3-606 and found
 
 
 32
 the test of whether a secured party or holder has unjustifiably impaired collateral not in his possession is that of reasonable care under all of the relevant circumstances of the case. The burden of proof is upon the party asserting the impairment of collateral to prove by a preponderance of the evidence that the holder has not used reasonable care under all the circumstances and to prove the monetary extent to which the collateral has been impaired as a direct result of the failure to use due care[.]
 
 
 33
 Here, in order for Moore to have protected his interest in lot 8, he would had to have bid approximately $45,000 at the foreclosure sale.[4] Hart has not demonstrated that Moore's failure to do this was unreasonable. Moreover, Hart has not mentioned any other actions that Moore could have taken to protect his interest in lot 8. Therefore, we find that Hart's obligation was not discharged.
 
 C.
 
 34
 The defendants argue that the special interrogatories submitted to the jury were erroneous. They contend the interrogatories stated facts the jury was supposed to find as if they had been established. We review jury charges as a whole, and will not find a cause for reversal unless it is likely the jury has been misled. Empey v. Grand Trunk Western R.R., 869 F.2d 293 (6th Cir.1989).
 
 The interrogatories are as follows:
 
 35
 1. Was Rivergrove Developers, Inc. a sham corporation which was jointly under the complete dominion and control of C. Eugene Goodwin and Daniel P. Goodwin at the time of a series of transactions whereby Daniel P. Goodwin (1) acquired an incomplete charter of incorporation for Rivergrove Developers, Inc. from A.S. Hart; thereafter (2) signed in behalf of Rivergrove notes of $45,000 and $55,000 for Lots 8 and 9 of Meadowgrove Farms Subdivision, Section A, which were subject to deeds of trust having a subordination clause to eighty percent of a future construction loan on the lots and thereafter, (3) Daniel Goodwin undertook development of the lots in the name of Rivergrove Developers, Inc. pursuant to a construction loan in which C. Eugene Goodwin was the lender; (4) thereafter C. Eugene Goodwin, after numerous advances to Rivergrove as a construction loan and a number of payments to C. Eugene Goodwin for rent, etc. and Daniel P. Goodwin as salary, withdrew further funding for development of Lots 8 and 9 with construction of [ ] residences thereon; (5) thereafter C. Eugene Goodwin caused foreclosure to be taken on the trust deeds and Daniel P. Goodwin caused Rivergrove Developers, Inc. to be rendered insolvent and subsequently have its charter revoked, all of which were done in the name of Rivergrove Developers, Inc. without Rivergrove having a separate mind, will or existence of its own?
 
 
 
 Yes or No
 
 
 [2]
 Was such dominion and control used to commit a wrong or a dishonest and unjust act in contravention of the rights of a third party Ronald K. Moore as holder of the trust deeds?
 
 
 Yes or No
 
 36
 3. Did the aforesaid control and breach of duty proximately cause injury or unjust loss to Ronald K. Moore?
 
 
 
 Yes or No
 While the wording of these interrogatories might have been improved, if anyone benefited from their submission, it was the defendants. Each of the three interrogatories required a single "yes" or "no" answer. Thus, the only way the jury could have found for Piper is if it found the defendants had satisfied every element listed in the respective interrogatories. For example, had the jury found any one of the elements in interrogatory 1 to be absent, the jury would have responded "no," thereby resulting in a verdict in favor of the defendants. Furthermore, a "no" response to either of the other interrogatories also would have resulted in a defendants' verdict. We do not believe the jury was misled by these interrogatories and, accordingly, we find no error.
 D.
 Defendants note that the order of judgment entered by the district court credited Daniel Goodwin and Eugene Goodwin for payments on the judgment by Hart, but failed to credit Hart for payments by Daniel Goodwin or Eugene Goodwin. Defendants contend this was an obvious oversight. Piper agrees, and thus we find Hart should be given credit on the judgment entered against him for any payment which may be received or obtained by Piper from Eugene Goodwin or Daniel Goodwin.E.
 The district court awarded attorney fees to Piper. Piper seeks leave of this court to submit an application for an additional judgment against the defendants for his attorney fees incurred upon this appeal. The defendants did not respond to this request in their reply brief, and we find no reason why Piper's request to apply for fees should not be granted.
 The decision of the district court is AFFIRMED, but we REMAND for further proceedings in compliance with this opinion.
 
 
 *
 The Honorable John Feikens, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 The sale contract for lot 9 contains an error as to the seller. At the time of the contract, Goodwin Development had title to lot 9; however, the contract lists A.S. Hart as the seller. This mistake might stem from Hart's ownership of Goodwin Development
 
 
 [2]
 The assignment letter executed by Moore states:
 CANCELLATION OF INDEBTEDNESS
 AND
 ASSIGNMENT
 Ron K. Moore and ARK, Inc., a Tennessee corporation wholly owned by Ron K. Moore, in consideration of the cancellation of all debts due and owing to Paul P. Piper, Jr. from Ron K. Moore in the principal sum of $400,000.00, do hereby transfer and assign, without recourse, any and all their interest in and to any and all causes of action, whether now existing or accruing hereafter, that they may have as against A.S. Hart, C. Eugene Goodwin, Joseph Russell, Carl Paterson, E.F. Trading Co., Inc., Guardian Trading Co., Rivergrove Development Co., Inc. and Daniel Goodwin, relating to any and all transactions of any nature whatsoever occurring between Assignors and any of the aforesaid named individuals and/or business entities.
 
 
 [3]
 Tenn.Code Ann. Sec. 47-3-202 provides, in part:
 47-3-202. Negotiation.--(1) Negotiation is the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary endorsement; if payable to bearer it is negotiated by delivery.
 (2) An endorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof.
 
 
 [4]
 At oral argument, counsel stated that $96,000 would had to have been paid at the foreclosure sale in order for Moore to protect his interest in lot 8. Eugene Goodwin testified at trial, however, that both lots were foreclosed for $90,000 and that lot 9 was foreclosed for $45,000. Based on this testimony, we have calculated the amount Moore would had to have spent to protect his interest in lot 8 to be $45,000. If both lots were foreclosed on and sold as one parcel, the counsel's reference to $96,000 would be correct. A resolution to this discrepancy is not necessary, for we have used the value more favorable to Hart and still find his contention to be without merit