NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0081n.06

No.  12-3409

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jan 22, 2013*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| TINA KENDEL, | ) | |
| | ) | |
| Plaintiff - Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| LOCAL 17-A UNITED FOOD AND | ) | STATES DISTRICT COURT FOR |
| COMMERCIAL WORKERS; HOWARD | ) | THE NORTHERN DISTRICT OF |
| BARNES, | ) | OHIO |
| | ) | |
| Defendants - Appellees. | ) | |
| | ) | |

Before: BOGGS, ROGERS, and STRANCH, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge.  Plaintiff Tina Kendel brought this lawsuit alleging

sexual harassment and gender discrimination against Local 17-A, United Food and Commercial

Workers ("Local 17-A"); the United Food and Commercial Workers International Union ("the

International"); and Howard Barnes, the former President of Local 17-A.  The International was

granted summary judgment.  Kendel's claims against Local 17-A and Barnes proceeded to trial and

the jury found against her on all claims.  Kendel filed post-trial motions contesting certain

evidentiary determinations and jury instructions.  The district court denied those motions, and

Kendel appealed.  We now AFFIRM the judgment of the district court.

## I.  BACKGROUND

Local 17-A is located in Canton, Ohio and represents workers at five food companies in the

negotiation of collective bargaining agreements (CBAs) and the administration of those agreements.

Local 17-A is a member union of the International and is governed in part by the constitution of the International. The International also provides assistance to Local 17-A in contract negotiation and some other activities.

Kendel was hired as an administrative assistant at Local 17-A in 1988. In 1999, Defendant Barnes was elected by the union membership to serve as President of Local 17-A. That same year, Barnes retained Kendel as an assistant and appointed her Secretary-Treasurer of Local 17-A. Secretary-Treasurer is an officer and board-member position that generally requires a membership election. Kendel was subsequently elected to the position in 2002 and re-elected in 2005 and 2008. Barnes was re-elected as President in 2002 and 2005. In 2008, however, Barnes lost his re-election bid to a candidate Kendel supported.

Kendel admits that during their first four years of working together Barnes did not treat her in an inappropriate manner, but she alleges that in 2003 or 2004 Barnes began making degrading and harassing comments to her based on her sex. Kendel also alleges that Barnes began excluding her from certain union meetings and negotiations, threatened her with violence, and on one occasion physically assaulted her and attempted to choke her. At her deposition, Kendel stated that by 2004 she believed Barnes saw her as a political threat to him and that Barnes might have been thinking she wanted to run against him for President of Local 17-A. She testified that Barnes did not directly tell her this, but rather:

> He would talk about, you know, everybody wants to be president. Somebody in here wants to run or something. He would like make – I don't know what you'd call them where you say something and you think that you're telling that person that its them. I mean, I didn't know what he meant half the time when he was talking about it.

2

Kendel Dep. 167–68, R. 98-2 at PageID # 783–84. Kendel began taking notes detailing Barnes's treatment of her and referencing specific incidents that occurred. She took the notes on little scraps of paper that she later typed; the first typed version was used in her charge before the Ohio Civil Rights Commission ("OCRC") and a different typed version was used in her litigation claims.

The final confrontation in the relationship occurred shortly before the January 17, 2008 Local 17-A election of officers. Kendel alleges that on January 7 Barnes accused her of manipulating the calculation of lost time for members on the election committee and thereby "sticking votes in [her] bra." She alleges that at the end of an argument Barnes grabbed her shoulder and was moving his hand toward her neck before she stepped out of the way. Kendel alleges that she somewhat turned around and said, "You just tried to choke me" then went to her office, called her husband, left the building, and eventually called 9-1-1 from her car. Two police officers responded to the scene, but no charges were filed.

On January 13, Kendel sent a letter about this incident and the alleged hostile work environment to Joseph Hansen, President of the International, requesting an immediate response and investigation. And, at some point between the incident and the Local 17-A election, a flier about the incident was circulated among the Local 17-A membership. On January 17, Barnes lost his re-election bid. Kendel was re-elected as Secretary-Treasurer.

On January 18, Hansen responded to Kendel's allegations with a letter. Hansen noted that Local 17-A was an autonomous body and that the International was not Kendel's employer. Hansen stated, however, that the International was committed to eliminating all forms of employment discrimination, and he promised Kendel an investigation of her allegations.

3

The International hired a law firm to investigate the incident, and attorney Mady Gilson carried out the investigation. Gilson traveled to Canton; reviewed documents that Kendel provided; and interviewed Kendel, Barnes, and witnesses provided by both Kendel and Barnes. At the close of the investigation, Gilson authored a short memorandum to the International in which she noted that the work relationship between Kendel and Barnes was "extremely difficult and at times unprofessional." She also noted that Barnes had been defeated in the election and had since retired from the plant at which he had worked. The memorandum concluded:

> Therefore, it appears that no further action is necessary; Ms. Kendel and Mr. Barnes no longer are working together at the Local, and Ms. Kendel is able to perform her duties as Secretary-Treasurer under a new Local President.
>
> I do note that to avoid further problems for themselves and the Local, Ms. Kendel and Mr. Barnes would be well advised not to have any further contact, either direct or indirect, with each other.

Gilson Mem., R. 98-10 at Page ID #1046. On July 10, 2008, Hansen sent a letter to Kendel repeating Gilson's reasoning and conclusions and noting that Barnes was no longer the president of Local No. 17A or a member of the UFCW. Hansen concluded that, as a result, there should be no continuing issues and no further action was necessary.

On July 2, 2008, Kendel filed a charge of discrimination against Local 17-A with the OCRC and included a typed version of some of the notes she had written about her interactions with Barnes. The OCRC determined that there was no probable cause to find that Local 17-A engaged in unlawful conduct. The EEOC adopted the finding of the OCRC and issued Kendel a right-to-sue letter.

On August 26, 2009, Kendel filed this lawsuit against Local 17-A, the International, and Barnes in both his individual and official capacity. The suit alleged three causes of action against each defendant: sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, §

4

703(a)(1), 42 U.S.C. § 2000e-2(a)(1); intentional infliction of emotional distress under Ohio law; and sexual discrimination in violation of Ohio Revised Code § 4112. Kendel subsequently moved unilaterally to dismiss the Title VII claim against Barnes in his individual capacity.

**A. Discovery and Gilson deposition**

The parties engaged in discovery over a period of several months during which Kendel filed notice to take Gilson's deposition. Gilson's deposition was taken via telephonic videotape on March 29, 2010. Responding to questioning by Kendel's attorney, Gilson described her investigation into Kendel's complaints, including her visit to Canton and interviews with Kendel, Barnes, and the other witnesses. Kendel's attorney asked Gilson for her "impression" of her interview with Barnes. In response, Gilson stated:

> My impression in talking to Mr. Barnes, particularly when combined with my talking to Mrs. Kendel, is that there was a lot of acrimony and hostility between them, largely of a political nature. They were in opposite camps and the witnesses were either staunch supporters of one or staunch supporters of the other, and I felt that they both were participants in a very difficult working relationship.

Gilson Dep. 43, R. 226 at PageID #4456.

Kendel's attorney also asked about the results of the investigation. Gilson responded that she had been asked to provide conclusions as to what had happened and whether there had been "actionable harassment," and that she determined there had been no such harassment. *Id*. at 4463. Gilson explained this as meaning that she found no conduct that rose to the level of sexual harassment under federal law. Kendel's attorney also asked Gilson to explain her statement that the relationship between Kendel and Barnes was "unprofessional," and Gilson responded that Kendel spoke of Barnes in very disrespectful terms and often made allegations that seemed to be extreme

5

and unwarranted.  Gilson said that fundamentally she saw the conflict as a political dispute between Kendel and Barnes.

**B. Summary judgment**

The defendants filed three separate motions for summary judgment.  The district court granted summary judgment to the International on all claims and to the remaining defendants as to the claims of intentional infliction of emotional distress.  The court, however, denied summary judgment to Barnes and Local 17-A as to Kendel's claims under Title VII and Ohio Rev. Code § 4112, noting evidence of Barnes's harsh criticism and treatment, the alleged physical attack, and Barnes's frequent use of the type of sexually-explicit and derogatory language that could plausibly support a hostile work environment sex-discrimination claim.

The court thus allowed Kendel to proceed to a civil jury trial against Local  17-A and Barnes in his official capacity on two hostile-work-environment claims: (1) a claim under Title VII and (2) a claim under Ohio Rev. Code § 4112.[1]  Because Kendel had dismissed the Title VII claim against Barnes in his individual capacity, the court allowed Kendel to proceed to trial against him in his individual capacity only on the state-law § 4112 claim.

**C. Motions *in limine* and trial**

---

[1]Ohio courts have held that federal case law interpreting Title VII is "generally applicable" to cases involving sexual harassment claims under Ohio Rev. Code § 4112.  *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).  Kendel alleges she was subject to "hostile work environment" sexual harassment, and to establish a *prima facie* case of such a claim under Title VII a plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was subjected to harassment, either through words or actions, based on sex; (3) the harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer.  *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009).

Both Barnes and Kendel filed motions *in limine* to prohibit the introduction of certain testimony and evidence at trial. Among other objections, Kendel objected to the introduction of Gilson's video deposition testimony on the basis that Gilson had not personally witnessed any interaction between Kendel and Barnes and her testimony was therefore inadmissible hearsay. In addition, Kendel argued that Gilson's testimony was irrelevant and that any probative value was outweighed by the unfair prejudice that would result from jurors substituting Gilson's judgment and opinions for their own.

The court overruled Kendel's objections to Gilson's testimony at the close of the plaintiff's case. In making this determination, the court noted that Kendel's testimony on direct examination made reference to the complaint letter she filed with the International and included the letter in evidence, but did not include or refer to Hansen's letters to Kendel in response. Because Kendel raised the inference that both the Local and the International took no action on her complaint, the court determined that it could not fairly bar the defendants from putting on evidence to clarify what had been done. The court suggested that it would address limiting instructions as to Gilson's investigation at the appropriate time.

The defendants introduced excerpts of Gilson's video testimony on the fourth day of trial, as the last of the defendants' twelve witnesses. Though the court had suggested a limiting instruction might be appropriate, Kendel did not request an instruction prior to the testimony or upon its completion. Rather, following Gilson's testimony, Kendel's counsel asked only to call Kendel back to the witness stand for rebuttal. During the rebuttal, Kendel's counsel finally introduced Hansen's letter, but did not address Gilson's testimony.

On the day after the last witnesses had testified, the parties met with the court to address final matters. Both parties moved for judgment as a matter of law under Fed. R. Civ. P. 50, and their motions were denied. The court acknowledged receipt (presumably from Kendel's counsel) of proposed jury instructions to limit consideration of the portion of Gilson's testimony in which she expressed her legal opinion that the plaintiff had no actionable claims. The court agreed that an instruction as to Gilson's testimony was appropriate and, noting that it had not viewed the deposition before it was played, indicated that it wished it had stricken a portion of the testimony regarding Gilson's conclusions as to the legal basis of Kendel's claims.

In response to a revised instruction suggested by the court, Kendel's counsel requested instead that the court strike the *entire* Gilson testimony. The court denied that request, again noting the relevance of Gilson's testimony to the question of whether the defendants had ever responded to Kendel's complaint to the International. The court did, however, restrict the defendants from using Gilson's testimony in any way in their closing arguments and accede to Kendel's request to set out the limiting instruction as to Gilson's legal conclusions with a separate heading in the jury instructions. The final instruction as read to the jury the following morning included the following:

> Any evidence to which I have sustained an objection and evidence that I have ordered stricken must be entirely disregarded. Specifically:
>
> Gilson testimony. You've heard the testimony of Mady Gilson. Her testimony was admitted into evidence to show that an investigation was conducted by the International Union after Ms. Kendel made a written complaint. You should disregard Gilson's testimony that there was no conduct that rose to the level of sexual harassment under federal law and not consider that portion of her testimony for any purpose.

Trial Tr. Vol. 6 at 1178, R. 342 at PageID #5805.

8

The parties also spent a significant amount of time debating the appropriate state-law standard for gender discrimination and discussing how to present that standard to the jury. They ultimately agreed that the same set of factors should be used to find the hostile-work-environment element for both the state and federal claims. Kendel's attorneys argued that the "based on gender" element should similarly be the same under both state and federal law, but the court agreed with defendants that the Ohio Supreme Court still maintained the standard articulated in *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 734–35 (Ohio 2000)—a standard that may be more difficult for a plaintiff to meet than the standard this court later articulated in *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270–72 (6th Cir. 2009).

The court then presented the parties with proposed interrogatories and verdict forms for the claims against each defendant. Though the agreed upon jury instructions had separately instructed the jury on the state and federal claims, the interrogatories did not. They read:

> Jury Interrogatory Number 1. This interrogatory relates to Ms. Kendel's claims against Local 17-A and Howard Barnes in his official capacity. With that in mind, did Kendel prove by a preponderance of the evidence that she was subjected to hostile work environment based upon gender?
>
> Interrogatory Number 2: This interrogatory relates solely to Ms. Kendel's claims against Howard Barnes in his individual capacity. With that in mind, did Ms. Kendel prove by a preponderance of the evidence that she was subjected to hostile work environment based upon gender?

Trial Tr. Vol. 6 at 1266, R. 342 at PageID #1266.

Kendel's attorneys reviewed the interrogatories that afternoon and agreed to them. *See* Trial Tr. Vol. 5 at 1149, R. 341 at PageID #5776 ("Your Honor we have reviewed the interrogatories. We have reviewed the verdicts. And we're satisfied, your Honor."). The next morning, before closing arguments, the court gave counsel an opportunity to raise any outstanding issues and neither party

9

raised any concerns about the interrogatories. After closing arguments and the delivery of the jury instructions and interrogatories, but before the jury had been excused, Kendel's attorney requested that the interrogatories be corrected to make it clear that the jury had the option of considering both federal and state claims against Local 17-A and Barnes in his official capacity. The court denied the request, stating that the issue should have been addressed before closing arguments and had therefore been waived.

**D. Post-trial motions**

After the jury returned a verdict against Kendel, Kendel filed two post-trial motions: (1) a motion for a mistrial; and (2) a motion for renewed judgment as a matter of law or, in the alternative, alteration or amendment of the judgment, or in the alternative, a new trial, pursuant to Federal Rules of Civil Procedure 50(a) and (b) and 59(a) and (e). The motion for a mistrial was based on the admission of Gilson's deposition testimony. The second motion was based on variety of alleged trial errors, including the admission of Gilson's testimony and the court's refusal to change the jury interrogatories to include separate reference to state-law claims.

In a fifty-one page opinion, the district court considered and denied both of Kendel's post-trial motions. The court exhaustively recounted the testimony of each of Kendel's witnesses and closely reviewed the direct examination and cross-examination of Kendel herself on the issue of her allegedly contemporaneous notes. The court highlighted the fact that Kendel had created three different versions of her notes and stated that this "ever-changing documentary evidence" and her evasive responses before the jury had effectively destroyed her credibility. In light of this conclusion, the court found that any error in the admission of Gilson's testimony was harmless. As to the jury interrogatory claim, the court found that Kendel had waived the claim by approving the

10

interrogatories prior to closing arguments. Finally, as to Kendel's other claims, the court found that she had either failed to show prejudice or had waived the claims by failing to raise them at the appropriate opportunities.

Kendel now appeals the district court's order, focusing on Gilson's testimony and the jury interrogatories. Kendel also briefly argues that other errors cumulatively merit reversal. We consider these arguments below.

## II. DISCUSSION

We begin by noting that our review encompasses both the federal claims raised against Local 17-A and Barnes in his official capacity and the state-law claims raised against all defendants. The district court exercised supplemental jurisdiction over Kendel's state-law claims pursuant to 28 U.S.C. § 1367. "A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999). Because we are reviewing a request for new trial based on federal evidentiary and procedural error, however, federal case law governs our analysis. *See Michigan First Credit Union v. CUMIS Ins. Soc., Inc.*, 641 F.3d 240, 245 (6th Cir. 2011) (following federal standard for reviewing a new trial motion in diversity). Similarly, though state law controls the substantive content of jury instructions, federal law governs the standard for determining prejudice. *See Bagherzadeh v. Roeser*, 825 F.2d 1000, 1003 (6th Cir. 1987) (applying federal law to review of jury-instruction prejudice in a diversity case).

### A. Standard of Review

Kendel appeals the denial of her request for a new trial, to which we apply an abuse of discretion standard. *See Barnes v. City of Cincinnati*, 401 F.3d 729, 743 (6th Cir. 2005). A district

11

court abuses its discretion when it "relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard." *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004). The district court's evidentiary decisions are also subject to an abuse of discretion standard. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141–42 (1997). While we review the factual findings underlying the conclusions of law for clear error, we review *de novo* the district court's conclusions of law. *See United States v. Martinez*, 588 F.3d 301, 309 (6th Cir. 2009).

To secure a new trial, however, it is not sufficient for the moving party to show that the district court made a mistake in admitting certain testimony or by using improper jury instructions. A motion for a new trial "will not be granted unless the moving party suffered prejudice." *Barnes*, 401 F.3d at 743 (citing *Philip Morris*, 362 F.3d at 891). We will not vacate a jury verdict based on the erroneous admission of evidence or improper jury instructions unless the testimony's admission or improper jury instructions "amounted to more than harmless error." *Field v. Trigg Cnty. Hosp. Inc.*, 386 F.3d 729, 736 (6th Cir. 2004) (applying the harmless error standard to the improper admission of evidence); *see Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994) ("An erroneous [jury] instruction, unless harmless, requires a new trial.").

The parties disagree on the harmless-error standard. Local 17-A and Barnes in his official capacity argue that the proper standard is whether the absence of error "would have caused a different outcome at trial." *Philip Morris*, 362 F.3d at 891 (quoting *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 514 (6th Cir.1998)). Kendel and Barnes in his individual capacity point to the traditional "fair assurance" standard for harmless error that we ratified in *Beck v. Haik*, 377 F.3d 624, 634–35 (6th Cir. 2004), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th

12

Cir. 2009). The fair-assurance standard "calls for reversal when the appellate court lacks a 'fair assurance' that the outcome of a trial was not affected by evidentiary error." *Beck*, 377 F.3d at 635.

Fair assurance is the proper standard. In *Beck,* we acknowledged some past equivocation as to the proper harmless-error standard for evidentiary issues in civil cases, but we considered and rejected the "caused a different outcome" formulation of *Morales* because it was inconsistent with previous published decisions of this court. *See Beck*, 377 F.3d at 635 (citing *Schrand v. Fed. Pac. Elec. Co.*, 851 F.2d 152, 157 (6th Cir. 1988)). While *Beck* was overruled on other grounds, defendants have provided no reason to revisit *Beck*'s careful harmless error analysis.[2]

In applying the fair-assurance harmless-error standard, we first ask whether evidentiary error occurred and then we "examin[e] the proceedings in their entirety." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 762 (1946)). Application of the test is "highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected, and the centrality of that issue to the ultimate decision." *Id.* (quoting *Schrand*, 851 F.2d at 157); *see also Mitroff v. Xomox Corp.*, 797 F.2d 271, 277 (6th Cir. 1986) ("[I]n close cases the improper admission of prejudicial evidence is all the more damaging . . . .").

---

[2]It is true that this court has continued to cite the *Morales* standard, even after we seemed to have settled the question in *Beck*. *See, e.g.*, *Nolan v. Memphis City Sch.*, 589 F.3d 257, 265 (6th Cir. 2009); *Dortch v. Fowler*, 588 F.3d 396, 402 (6th Cir. 2009); *Taylor v. TECO Barge Line, Inc.*, 517 F.3d 372, 378 (6th Cir. 2008); *Tisdale v. Fed. Exp. Corp.*, 415 F.3d 516, 535 (6th Cir. 2005); *Barnes*, 401 F.3d 729. Though the *Morales* standard is certainly easier to conceptualize, our prior published decisions "remain[] controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Beck v. Haik*, 377 F.3d 624, 635 (6th Cir. 2004) (quoting *Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001)). Thus, the fair-assurance standard stated in *Beck* remains the proper standard.

## B. Evidentiary Error

On appeal, Kendel presents ten separate questions of law related to the district court's admission of Gilson's testimony, but all ten issues boil down to two claims. First, Kendel claims it was prejudicial error for the court to admit Gilson's legal opinion that there was no conduct by Barnes that rose to the level of sexual harassment under federal law. Kendel argues that this statement was opinion testimony by a lay witness as to the "ultimate issue" to be determined by the jury, and therefore was improperly admitted. She argues that the statement was highly prejudicial and that the error was not cured by the court's limiting instruction. Second, Kendel claims it was prejudicial error for the court to admit the rest of Gilson's testimony because *all* of Gilson's testimony was hearsay evidence and irrelevant, and any probative value was outweighed by unfair prejudice under the familiar evidentiary balancing test of Fed. R. Evid. 403.

### 1. Ultimate issue testimony

We assume for the purpose of argument that the admission of Gilson's legal conclusion was not appropriate. The district court itself stated that this part of Gilson's testimony should not have been admitted into evidence because Gilson had voiced an opinion as to one of the ultimate issues to be decided by the jury in the case. Federal Rule of Evidence 704(a) provides that opinion evidence is not "automatically objectionable" when it "embraces an ultimate issue." However, any opinion testimony must be "helpful to the trier of fact." *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) (quoting Fed. R. Rule 704 advisory comm. notes). A lay witness's opinion testimony as to an ultimate issue will "seldom" meet this test because "the jury's opinion is as good as the witness'[s]." *Mitroff*, 797 F.2d at 276 (citing Fed. R. Evid. 704).

14

As a result, the question to address is not whether it was evidentiary error to admit the "ultimate issue" testimony. Given the district court's expressed concerns, we assume that it was. This claim turns on whether the court's limiting instruction was sufficient to render any error harmless. We agree with defendants and the district court that it was.

Courts generally presume that properly-instructed juries are "capable of considering evidence for one purpose but not another." *Washington v. Hofbauer*, 228 F.3d 689, 705 (6th Cir. 2000) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). This presumption applies "unless there is an 'overwhelming probability' that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citations omitted).

We cannot agree with Kendel that there was an overwhelming probability that the jury would be unable to follow the district court's instructions in this case. Kendel seeks to rely on our decision in *Field v. Trigg County Hospital, Inc.*, 386 F.3d 729, 736 (6th Cir. 2004), in which we found that a jury instruction did not cure the evidentiary error at issue. But the court's instruction in *Field* was "patently jumbled and confusing," which made it impossible to determine what the court meant as to how the evidence should be treated. 386 F.3d at 737. Here, to the contrary, the trial court's jury instruction was clear and provided a reasonably straightforward rationale for why Gilson's testimony had been admitted and for what reasons it could be permissibly considered. In addition, the court prohibited the defendants from referencing Gilson's testimony in closing argument and agreed to Kendel's request that the instruction be set apart in its own section and near the beginning of the jury instructions. Kendel's reference to *Field* is therefore inapposite.

15

Further, though Gilson's legal conclusion was clearly damaging testimony, we cannot agree that it was so "devastating" that even a clear and properly-placed jury instruction could not be effective. First, Kendel ignores the testimony before the jury regarding Gilson's role—that she had been employed by the International, formerly a defendant in the case, to carry out the investigation of one of its member unions, Local 17-A. Second, Kendel's oft-repeated argument, that the parties agree Gilson's testimony was the "strongest" evidence in defendants' favor, is strongly disputed. Defendants deny any such agreement, noting that Kendel's conclusion is incorrectly drawn from a statement in Barnes's motion for summary judgment that was made in reference to the lack of credibility of Kendel's claims. Defendants aver that their strongest evidence is the contradictory and unsupported testimony of Kendel herself, particularly because the relevant issue is the evidence the jury considered at trial, not statements in historic pleadings.

As the district court concluded in its analysis of Kendel's post-trial motions, the defendants irreparably undermined Kendel's credibility during cross-examination and through presentation of the initial defense witnesses. None of Kendel's witnesses testified to having witnessed Barnes using sexually derogatory language toward Kendel; all of their information had come from Kendel herself. More importantly, Kendel had allegedly taken contemporaneous notes of various incidents, but it was revealed at trial that she had added the most inflammatory accusations for the first time to the version of her notes that she created for presentation at trial—even changing certain terms from how they were written in her original notes to be more supportive of her gender-discrimination claim. These discrepancies were raised repeatedly by defense counsel during Kendel's cross-examination as a challenge to her credibility.

Other critical inconsistencies dogged the core of Kendel's claim of a hostile work environment based on sex discrimination. Testimony established that Barnes had initially appointed Kendel to the Secretary-Treasurer position and had worked well with her for a number of years. Other women testified to experiencing good and respectful working relationships with Barnes. And Kendel's case evidenced internal inconsistencies. She claimed she had complained about Barnes to the Local 17-A executive board, but then later admitted that there was no mention in the board's minutes of her ever having done so. Kendel alleged at trial that Barnes had grabbed her shoulder and attempted to choke her, but one of the officers who responded to the scene (a female officer) testified that Kendel informed the officers that there had been no physical contact between her and Barnes.

Gilson's testimony also contained conclusions supported by other witnesses—that coarse language was frequently used in and around the union office and that the hostility between Kendel and Barnes was primarily of a political nature. One of Kendel's witnesses testified that the first time Kendel complained to her about Barnes was when Kendel was actively campaigning against him in 2007. And Kendel herself testified that in late 2003 or early 2004, she concluded that Barnes saw her as a threat to his position as President and believed she wanted to take over as President and take his job from him. Kendel also admitted that she actively campaigned against Barnes, visiting factories to hand out flyers for his opponent the week after the "choking" incident.

Considering all of the above testimony, the district court concluded that the admission of Gilson's legal conclusion statement was harmless error. Kendel has not argued that the district court used the wrong legal standard, and we can identify no basis to conclude that the district court's factual findings were clearly erroneous. We therefore cannot find that this determination represented an abuse of discretion.

A "[r]eversal based on improper admission of evidence is appropriate only when the admission interfere[s] with substantial justice." *Slayton v. Ohio Dept. of Youth Servs.*, 206 F.3d 669, 677 (6th Cir. 2000) (internal quotation marks omitted). Though some of the evidence presented at trial was concerning, the body of evidence can not be properly classified as "closely balanced." *Schrand*, 851 F.2d at 157. Thus the district court's careful jury instructions provided fair assurance that the outcome of the trial was not affected by the admission of Gilson's ultimate fact testimony. Substantial justice does not support reversal on this ground.

### 2. Other Gilson testimony

Kendel also argues that the district court committed evidentiary error by admitting the remainder of Gilson's testimony—the testimony other than her legal conclusion. She contends that Gilson's testimony in its entirety was inadmissible hearsay. Kendel additionally contends that Gilson's testimony was inadmissible pursuant to the relevance requirement implicit in Rule 401 and in any case should not have been admitted under the relevance and unfair-prejudice balancing test of Fed. R. Evid. 403. We again consider the district court's evidentiary decisions under the abuse of discretion and harmless error standards.

First, the hearsay question. Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted," Fed. R. Evid. 801(c), and is inadmissible except as specified under the Federal Rules of Evidence. *See* Fed. R. Evid. 802. Kendel argues that because Gilson did not personally witness any interaction between Kendel and Barnes, all of Gilson's testimony was based on the statements that Kendel, Barnes, and their witnesses made to her during her investigation, and was therefore hearsay.

18

The district court addressed this issue repeatedly during the trial and incorporated its reasoning into the denial of Kendel's post-trial motions. As the district court noted, whether testimony is considered hearsay depends on the purpose for which it is offered and admitted into evidence: "the hearsay rule bans in-court repetition of extra-judicial utterances only when they are offered to prove the truth or falsity of their contents." *United States v. Gibson*, 675 F.2d 825, 833 (6th Cir. 1982) (citing Fed. R. Evid. 801(c)). In considering the motion to exclude Gilson's testimony, the district court explained that Kendel had insinuated on direct examination that her harassment complaint to the International had been ignored. Gilson's testimony, even if otherwise hearsay, could therefore be admitted for the nonhearsay purposes of demonstrating that the International did respond to Kendel's complaint with a thorough investigation. The truth or falsity of the statements by the witnesses Gilson interviewed was immaterial to that purpose.

Gilson's testimony met the relevance requirement for the same reasons. Evidence is relevant if it has "any tendency to make a fact more probable or less probable . . . and . . . the fact is of consequence in determining the action." Fed. R. Evid. 401. As the district court instructed the jury in this case, whether an employer failed to take immediate and appropriate corrective action may be one of the elements of a gender-discrimination claim. Given Kendel's testimony about her complaint to the International, an explanation of Gilson's investigation was appropriate and helpful to the jury's understanding of what action the International did take and why neither Local 17-A nor the International took any further action.

Whether at least some part of Gilson's testimony should have been excluded under Rule 403 is a closer question. Though Kendel's counsel never requested specific tailoring of Gilson's testimony, a shorter portion of the deposition might have achieved the purpose of explaining the

19

investigation and its results. Some of Gilson's opinions may therefore have been of limited relevance. Rule 403, however, states that relevant evidence may be excluded "if its probative value is *substantially* outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403 (emphasis added). This balancing test by its nature requires a judgment call by the district court, made with the assistance of the arguments provided by counsel. We are not convinced that Kendel was significantly prejudiced by the admission of Gilson's other testimony. The district court therefore did not abuse its discretion in admitting the testimony.

Moreover, even if Gilson's entire testimony were admitted in error, that error was harmless for many of the same reasons that admission of Gilson's ultimate issue testimony was harmless. In applying the fair-assurance harmless-error standard, we "examin[e] the proceedings in their entirety." *Beck*, 377 F.3d at 635 (quoting *Kotteakos*, 328 U.S. at 762). Here, Kendel's credibility missteps prevented the evidence from being "closely balanced" and rendered it more "one-sided." *Id.* (quoting *Schrand*, 851 F.2d at 157). We therefore have fair assurance "that the outcome of a trial was not affected by evidentiary error." *Beck*, 377 F.3d at 635.

**C. Jury interrogatories**

Kendel's request for reversal of the verdict based on imprecise jury interrogatories also fails. Kendel acknowledges that the trial court properly instructed the jury that she was maintaining both state and federal claims of gender discrimination against Local 17-A and Barnes in his official capacity, but only a state claim against Barnes in his individual capacity. She argues, however, that immediately thereafter the court misspoke and gave instructions that made it seem as though *only a federal* claim remained against Local 17-A and Barnes in his official capacity. Compounding this problem, she contends, the jury interrogatories given later did not discuss the existence of state or

federal claims and simply asked whether, for each defendant, Kendel succeeded in proving the existence of a hostile work environment. Thus, Kendel argues, the court's instructions and interrogatories robbed her of her state-law claim against Local 17-A and Barnes in his official capacity.

The district court did not reach the merits of this claim because it determined that Kendel had waived any objection to the format of the interrogatories. On appeal, Kendel presses that an objection to an interrogatory is not waived until the jury is discharged. We need not consider Kendel's theory of waiver, however, because the district court's waiver determination was not based solely on the untimeliness of Kendel's objection. The court determined that Kendel had previously *expressly* waived any objections to the interrogatories by telling the court that she had reviewed the interrogatories and verdicts and was satisfied. Without providing any excuse or explaining the basis of his previous waiver, Kendel's counsel noted that the problem with the interrogatories did not just occur to him until after they had been delivered to the jury. In addition, Kendel's counsel failed to assert why or how Kendel could have been prejudiced by the alleged error. In this situation, we agree with the district court that Kendel waived her objections to the interrogatories. It was not an abuse of discretion for the court to deny Kendel's request to revisit her prior waiver after the instructions and interrogatories had already been delivered.

Even if we did consider the merits of Kendel's jury-interrogatories claim, we would not reverse the jury verdict. There may be cause for reversal of a jury verdict where it is likely that interrogatories may have misled the jury. *Piper v. Goodwin*, 20 F.3d 216, 221 (6th Cir. 1994). Even so, we still review any error to determine if it was harmless. *See Anderson*, 17 F.3d at 556. The defendants argue that any error in this case was harmless because Kendel agreed during the

21

negotiations over the jury instructions that the factors in the hostile-work-environment claim are the same under both federal and Ohio state law. If anything, defendants argue, Ohio state discrimination claims are more difficult to sustain than federal claims because the "based on sex" element may be more difficult to meet under Ohio law than it is under federal law. *Compare Hampel*, 729 N.E.2d at 734–35, *with Gallagher*, 567 F.3d at 270–72. Thus, even if both claims were viewed under federal law, no detriment resulted to Kendel.

Kendel, on the other hand, has entirely ignored the issue of harmless error. She did not during trial, nor does she now, articulate any way in which she was prejudiced by the jury instructions. Kendel has not explained how or why the jury could have found in her favor on the state-law claim while finding against her on the federal claim. In sum, Kendel waived any objection to the interrogatories at trial and now has failed to provide any rationale for vacating the jury's verdict. We therefore cannot grant the relief she requests.

## D. Cumulative error

Errors that do not alone require reversal may cumulatively merit reversal for a new trial under Fed. R. Civ. P. 59. *See, e.g., Michigan First Credit Union*, 641 F.3d at 251. Kendel's cumulative error claim, however, is based on two incidents with which we can find no fault at all—much less sufficient error to merit retrial.

In the first incident, the district court made copies of a combination of Kendel's exhibits for the jury, but did not provide an additional copy to her. Because the exhibits were her own, Kendel does not claim that she somehow was unable to view them. In fact, Kendel does not explain what prejudice she may have suffered from the failure to make an additional copy, and we cannot discern any prejudice on our own. In the second incident, the court excused the jury during Kendel's cross-

22

examination in order to admonish Kendel for her unresponsive answers.  Kendel claims the court did not do the same for defense witnesses, and therefore this action left the jury with an unfavorable impression of Kendel.  However, as defendants pointed out, the court *did* admonish Barnes for his evasive answers, and did so in the presence of the jury.  Kendel does not explain how it was more prejudicial for the court to admonish Kendel out of the presence of the jury than for the court to do so to Barnes in front of the jury.  In any event, even if it were prejudicial, the jury recess would fall far short of reversible error in this case.

### III.  CONCLUSION

For the reasons stated above, we AFFIRM the order of the district court.