[Cite as *Dept. of Natural Resources v. Knapke Trust*, 2015-Ohio-470.]

## IN THE COURT OF APPEALS OF OHIO
### THIRD APPELLATE DISTRICT
### MERCER COUNTY

STATE OF OHIO,
DEPARTMENT OF NATURAL
RESOURCES,

      PLAINTIFF-APPELLANT,                CASE NO. 10-13-25

      v.

MARK L. KNAPKE REVOCABLE
LIVING TRUST, ET AL.,                O P I N I O N

      DEFENDANTS-APPELLEES.

Appeal from Mercer County Common Pleas Court
Trial Court No. 12-CIV-201

Judgment Affirmed

Date of Decision: February 9, 2015

APPEARANCES:

    *Scott D. Phillips and Frank J. Reed, Jr.* for Appellant

    *Bruce L. Ingram and Thomas H. Fusonie* for Appellees

Case No. 10-13-25

**SHAW, J.**

{¶1} Plaintiff-appellant State of Ohio, Department of Natural Resources ("ODNR") appeals the November 21, 2013 judgment of the Mercer County Common Pleas Court entering a jury's award of $293,250 to the defendants-appellees Mark L. Knapke Revocable Trust, et. al.[1] for ODNR's appropriation of a permanent flowage easement on the Knapke farm.

{¶2} The facts relevant to this appeal are as follows. Mark Knapke purchased 34.5 acres of farmland in Mercer County, Ohio, from his nephew Chad Knapke in 2003. Mark subsequently transferred the Knapke farm into the Mark L. Knapke Revocable Trust.

{¶3} Due to a spillway modification to Grand Lake Saint Marys ("GLSM") flooding increased on the Knapke farm shortly after it was purchased by Mark. In 2009, the Knapkes and other landowners who were impacted by the increased flooding that resulted from the GLSM spillway modification filed a complaint for a writ of mandamus with the Ohio Supreme Court seeking an order to compel ODNR and its Director to initiate appropriation proceedings for the taking of their property. Ultimately the Ohio Supreme Court determined a taking had occurred and ordered ODNR to commence appropriation proceedings for a permanent

---

[1] The defendants-appellees are referred to collectively in this opinion as "the Knapkes."

flowage easement. *See State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117.

{¶4} Following the Ohio Supreme Court's decision, with respect to this case, on November 27, 2012, ODNR filed a Petition to Appropriate Flowage Easement and to Fix Compensation for the Knapke farm. (Doc. No. 3). On December 19, 2012, the Knapkes filed their answer contending that ODNR had not made a good faith offer for the permanent flowage easement, and therefore demanded a jury trial. (Doc. No. 9).

{¶5} Since the parties ultimately disagreed as to the value of the flowage easement the case was set for a jury trial for a jury to determine the value of the appropriation. The extent of the take was not to be determined by the jury. The *only* determination to be made by the jury at trial was the compensation to the Knapkes for the flowage easement. The Knapkes were to be compensated for the difference between the value of the Knapke farm before and after the flowage easement. Pursuant to R.C. 163.09 neither party had a burden of proof when determining the value of the appropriation. The jury was simply required to evaluate the evidence and reach a consensus as to the value.

{¶6} The jury trial was held October 2, 2013, through October 4, 2013. At trial Mark Knapke testified that he bought the 34.5 acre farm as a retirement investment from his nephew, Chad Knapke, in 2003 for $110,500. When he

purchased the land, Mark also agreed to allow his nephew Chad to continue farming the land.

**{¶7}** Mark testified that to his knowledge, there was little flooding on the farm prior to his purchasing it in 2003. (Tr. at 130-131). However, Mark testified that after he had purchased the property the farm had experienced flooding in seven of the ten years he had owned it. (Tr. at 133).

**{¶8}** Specifically, Mark testified that in 2003, the first year he owned the land, all 34.5 acres were flooded to the extent that the land was covered in water at least 5 to 6 feet deep, and that he could not access the farm because the surrounding roads were shut down due to high water. (Tr. at 136). The flooding also killed the crops that had been planted that year.

**{¶9}** Mark testified that the entire farm was again flooded in the Winter of 2005 with several feet of water on the farm for a week to ten days. (Tr. at 136). Mark testified that the property also flooded in the Spring of 2007, Fall of 2008, Spring of 2009, in 2010, and in late Winter/early Spring of 2011. (Tr. at 137-138). According to Mark the flooding in 2011 covered all of the land for multiple weeks. (Tr. at 140). Mark also testified that the land flooded in the Spring of 2013. (*Id*. at 141). Mark testified that the flooding carried debris onto the Knapke farm and that he received no assistance for the cleanup resulting from GLSM flooding. (Tr. at 146-47, 153).

{¶10} Chad Knapke also testified at trial. Chad testified that he and his wife received what is now the Knapke farm in 2000 from Chad's wife's family. (Tr. at 176). Chad testified that he started farming the land in 2000 and did not observe any flooding prior to 2003. (Tr. at 177). Chad testified that he sold the Knapke farm to Mark in 2003 for less than market value in part because he wanted to keep farming it. (Tr. at 179).

{¶11} Chad testified that in 2003 they got no crops off of the flooded portion of the land. (Tr. at 183). He also testified that as a result of the flooding he had to use a boat to get on and off the Knapke farm. (Tr. at 182). Chad testified to extensive floods in 2005 and 2011 where the water became eight to ten feet deep and was on the property from 14 to 21 days. (Tr. at 185, 189). He also testified that in the Spring of 2013 the land flooded for 7-10 days at four to six feet deep, and that there was flooding in other years, specifically 2008, 2009, and 2010. (Tr. at 186, 190).

{¶12} In addition, Chad testified that as a result of the flooding the Knapke farm at times reeked of sewage, that there were fish, ducks, and geese on the property, including fish and other animal carcasses that would get trapped on the farmland as the water receded. (Tr. at 185). Chad further testified that trash and debris were carried onto the land by the flood water, including car tires, corn stalks, pop cans, plastic pieces, and large branches. (Tr. at 185-189). Chad

testified that he has had three-foot piles of debris that he has had to dispose of, which required him to burn, or break the debris apart after getting a loader to pick the trash up or haul it off to a landfill. (Tr. at 193). Chad also testified that as a result of the flooding there was a greater risk of tile blowouts, and lower yields on the crops. (Tr. at 194-195). Chad testified that due to soil compaction resulting from the flooding he had to perform extra work to "chisel" the soil and "break it back up." (Tr. at 192).

{¶13} The Knapkes' expert, Richard Vannatta, then testified at trial as to his appraisal of the Knapke farm. Vannatta testified as to his qualifications as an appraiser and how he formed his opinions as to the value of the Knapke farm. Ultimately Vannatta testified that the value of the Knapke farm prior to the flooding/flowage easement was approximately $505,800, and that the current value of the Knapke farm with the permanent flowage easement was $50,600. Thus Vannatta testified that the Knapkes' were owed the difference between those two amounts—$455,200—for ODNR's appropriation of a permanent flowage easement. (Tr. at 283). Vannatta's report containing his findings was introduced into evidence.

{¶14} After Vannatta's testimony was concluded, the Knapkes rested their case. ODNR objected to the inclusion of some of the photographs in Vannatta's report, including photographs of the GLSM spillway, neighboring

roads/properties, and photographs of a news clipping detailing a girl who nearly drowned as a result of GLSM flooding. ODNR's objections were overruled.

**{¶15}** In ODNR's case-in-chief, ODNR called its own expert, Thomas Horner, who testified as to his qualifications and how he formed his opinions on the value of the Knapke farm. Ultimately Horner testified that the Knapke farm prior to the flooding and appropriation was worth $345,600, and after the appropriation was worth $261,100. (Tr. at 378, 396). So according to ODNR's expert, the Knapkes were owed $84,500. Horner's report was also introduced into evidence.

**{¶16}** Before ODNR rested its case, ODNR stated that it wished to call another witness who would testify to changes in lake-level management since 2011. The court excluded the testimony of this witness, partly on the basis that the witness's testimony would go to the extent of the take, which was not an issue for the jury, rather than the value of the flowage easement, which was the sole issue for the jury's determination. ODNR summarily proffered the proposed witness's testimony and then rested its case. (Tr. at 462-463).

**{¶17}** Following closing arguments and jury instructions, the case was submitted to the jury. The jury returned a verdict for the Knapkes to receive $293,250 for the flowage easement.

{¶18} A final judgment entry was entered in this case on November 21, 2013. It is from this judgment that ODNR appeals, asserting the following assignments of error for our review.

**ASSIGNMENT OF ERROR 1**
**THE TRIAL COURT ERRED BY REFUSING TO GRANT ODNR'S REQUEST FOR A JURY VIEW.**

**ASSIGNMENT OF ERROR 2**
**THE TRIAL COURT ERRED BY ADMITTING LANDOWNERS' IRRELEVANT, PREJUDICIAL EXHIBITS AND TESTIMONY, BUT AT THE SAME TIME EXCLUDING ODNR'S RELEVANT, PROBATIVE EVIDENCE.**

**ASSIGNMENT OF ERROR 3**
**THE TRIAL COURT ERRED BY PROVIDING THE JURY WITH PREJUDICIAL JURY INSTRUCTIONS**.

{¶19} As ODNR contends that that errors committed by the trial court cumulatively constituted prejudicial error and thus deprived ODNR of a fair trial, we will address the assignments of error together.

*First, Second, and Third Assignments of Error*

{¶20} In ODNR's first assignment of error, ODNR contends that the trial court erred by refusing to grant its request for the jury to view the Knapke farm. In ODNR's second assignment of error, it contends that the trial court erred by permitting "prejudicial exhibits and testimony" while also erroneously excluding testimony of a proffered witness of ODNR. In ODNR's third assignment of error,

ODNR contends that the trial court erred by providing prejudicial jury instructions.

*Jury View*

{¶21} ODNR first contends the trial court erred by denying its request for a jury view of the Knapke farm. We review a trial court's decision on whether to grant or deny a jury view under an abuse of discretion standard. *See Proctor v. Wolber*, 3d Dist. No. 5-01-38, 2002-Ohio-2593. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983)

{¶22} Revised Code 163.12 governs a request for a jury view in an appropriation proceeding, and reads as follows: "A view of the premises to be appropriated or of premises appropriated shall be ordered by the court when requested by a party to the proceedings." Despite the mandatory wording of the statute, we held in *Proctor v. Wolber*, 3d Dist. No. 5-01-38, 2002-Ohio-2593, that " 'in unusual circumstances the court could exercise its discretion to deny a view.' " *Proctor v. Wolber*, 3d Dist. Hancock No. 5-01-38, 2002-Ohio-2593, ¶ 57, citing *City of Akron v. Alexander*, 5 Ohio St.2d 75, 77 (1965). (Citation omitted).

{¶23} In further clarifying the circumstances where denial of a jury view may be proper, we held that

> **[d]enial of the view is appropriate where the only purpose it could serve would be to show the property in an unfair light, legislative purpose would not be served in granting the view of the premises, and the benefits of the view are outweighed by the injustice to the property owner and would deprive him of compensation to which he is entitled. Concomitantly, we find that denial is proper where, in the exercise of its discretion, the trial court finds that the prejudicial nature of the view exceeds its illustrative benefits or efficacy.**

(Internal citations omitted). *Id.*

{¶24} In this case the trial court denied ODNR's request stating the following.

> **\* \* \* in the exercise of its sound discretion, the court hereby determines that the request is without good cause, specifically because various photographs of the properties to be valued by the jury will be proffered as evidence, and because if a jury view was ordered, the jurors would be instructed that what they observed during the jury view could not be considered by them as evidence, the court believes it would be difficult for the jury to separate what the jurors see during a jury view and what is depicted in the photographs admitted into evidence in rendering the verdict. Therefore, the court determines that plaintiff's request for a jury view should be denied.**

(Doc. 42).[2]

{¶25} The blanket wording of the statute in R.C. 163.12 covers all appropriation proceedings. However, the circumstances in this case were somewhat atypical, as the flowage easement was being acquired for a temporary and recurring flooding condition where flooding is not present all of the time,

---

[2] The trial court's entry indicates that it heard oral arguments on the matter via telephone.

unlike a permanent taking or appropriation where the jury would be viewing a defined piece of land being permanently acquired by the state.

{¶26} In situations of a specific permanent and fixed appropriation of a stretch of land—for example land next to a highway—a jury view may well assist the jury in understanding the logistics relative to the remaining property. However in this instance the flooding condition pertinent to the flowage easement is temporary and recurring. Unlike a highway appropriation or other fixed easement, the taking in this case is not fixed or constant and changes dramatically based on the temporary and recurrent flood patterns.

{¶27} The visual condition of the property thus ranges from land fully covered with growing crops, to land that is 99% covered in 5 to 6 feet of water, and then to land that is not covered with water or crops but with piles of debris and dead wildlife. A jury view during any one of these phases alone would have provided a mere snapshot of the land in one condition without any similar visual by the jury of the land in a completely different extreme, which could have been prejudicial to either party.

{¶28} On the other hand, pictures were introduced into evidence at trial depicting the land when it was flooded, and when crops were growing on the land. Extensive testimony was introduced through the Knapkes regarding the duration and the amount of the flooding on the property, and the fact that crops had been

grown and harvested on the property in 9 out of the previous 10 years. The jury was also told specifically by Mark Knapke that the land does not flood every day, week, or month. In fact, Mark testified that there were *years* where he experienced no flooding *at all*. Furthermore, the jury was explicitly told by Mark Knapke that at the time of trial corn was growing on the property and that it was six to six-and-a-half feet high at that time. In addition, pictures were introduced through ODNR's expert's appraisal report from September 26, 2013, only one week prior to the trial, illustrating corn growing on the Knapke farm and dry roadways surrounding the farm.

{¶29} Thus the jury was clearly made aware that crops were growing on the Knapke farm at the time of trial, that the property was not flooded at the time of trial, and that the crops were healthy. The jury was clearly aware that crops were typically harvested on the property and that the flood pictures introduced by the Knapkes represented a temporary condition and were not indicative of how the Knapke farm looked at the time of trial. Therefore, on the basis of all of the testimony and the exhibits introduced into the record, it is unclear how ODNR can establish *any* resulting prejudice based on the trial court's decision to not grant the jury view.

{¶30} Moreover, ODNR has not established how something that could not even be considered as evidence by the jury was prejudicial to the outcome of this

trial. Accordingly, we cannot find that any prejudice resulted, or that the trial court abused its discretion in denying the request for a jury view in this instance. Therefore, ODNR's argument is not well-taken.

*Evidence*

**{¶31}** ODNR next contends that the trial court made several errors in admitting and excluding evidence at the trial. In deciding whether a court erred in admitting or excluding evidence, we review a trial court's decision under an abuse of discretion standard. *Ayers v. Ishler*, 5th Dist. Delaware No. 11 CAE 01 0001, 2011-Ohio-4272, ¶ 23 ("The admission or exclusion of evidence is left to the sound discretion of the trial court.")

**{¶32}** ODNR contends first that the trial court erred in allowing the Knapkes to introduce photographs of the GLSM spillway and photographs of flooding on surrounding streets and properties as part of Vannatta's appraisal report. ODNR objected to these photographs before the trial, during the trial, and when the photographs were introduced into evidence. Specifically, ODNR argues that the photographs were prejudicial, irrelevant and confusing to the jury.

**{¶33}** Conversely, the Knapkes contend that the photographs of the surrounding streets, land, and the GLSM spillway were used by Vannatta in his appraisal report to determine the value of the Knapke farm. Vannatta testified that he considered the surrounding properties, roads, and bridges, and the photographs

of them, as an informed buyer would also consider them, particularly with regard to access to the Knapke farm when flooding occurs.

{¶34} Vannatta testified that due to flood-encumbered roadways a buyer would have to take into account inhibited traffic, the fact that EMS could not get to the property if there was a problem and that neighboring lands were also damaged by the flooding. (Tr. at 255). Vannatta testified that an informed willing buyer would consider these things. (Tr. at 256).

{¶35} In addition to the arguments made by Vannatta and the Knapkes, we believe the flooding of the surrounding areas was also corroborative of the severity of the flooding on the Knapke farm. Furthermore, even ODNR's expert's appraisal report included some discussion of access to the Knapke farm and the roads, clearly indicating the relevance of this issue to the appraisal process. Based on Vannatta's testimony, we cannot find that the trial court abused its discretion in admitting these specific photographs and we therefore agree with the Knapkes on this issue.

{¶36} Nevertheless, even if the photographs had been improperly admitted into evidence, we could not find these particular photographs to be prejudicial as there is no indication that they specifically influenced the jury's finding. Moreover, the photographs in Vannatta's report were clearly identified with captions, alerting the jury to what they were looking at, making it difficult for

ODNR to establish that the jury somehow confused these photographs with photographs of the Knapke farm. Therefore ODNR's arguments with respect to these specific photographs are not well-taken.

{¶37} ODNR next contends that the trial court erred by allowing the introduction of a picture of the top half of a newspaper and a photograph of a car mostly submerged in water, which were both included in one page of Vannatta's appraisal report. The majority of the picture of the newspaper contains the headline "Communities flooded with woes," and has two grainy black and white pictures that appear to illustrate some flooding. There is also the beginning of a news story on the left column of the newspaper titled "Divers pull woman from car." The one paragraph visible of the story states that a woman was in critical condition as a result of nearly drowning. Below the picture of the top half of the newspaper is a photograph of part of a car that is sticking out of flood water with the caption: "View of car washed off roadway." ODNR claims that the newspaper clip along with the photograph of the car washed off of the roadway in Vannatta's appraisal report were irrelevant and prejudicial. We agree with ODNR on this issue.

{¶38} Vannatta testified that a willing buyer would consider events such as those depicted in the news story and the photograph of the submerged car when determining to buy the property. Vannatta identified the article and the

photograph in his appraisal report by stating that the article talked "about a young lady running off of State Route 49. I believe it's going north and then went to the northeast corner of Wabash and 49, hydroplaned it into the water; and the car's upside down." (Tr. at 254-255).

{¶39} Regarding why Vannatta included this story and the photograph in his report, he testified, "[t]here's a fear in the neighborhood if things like this are continually happening and an informed person sees that, then that's one thing that would even say to them maybe I don't want to buy here. If I do buy, I want a significant * * * reduction in price or I'm not going to buy." (Tr. at 255).

{¶40} We might accept to some extent the Knapkes' claim that a willing buyer would consider stories such as these. Nevertheless, we find that even if these photographs had some relevance, they were more prejudicial than probative and should have been redacted or excluded from the trial altogether. Thus ODNR's argument on this point is well-taken and we find it was error to allow admission of this particular page of the report. However, we cannot find that the prejudicial impact to the trial as a whole of this single page in Vannatta's report constitutes reversible error given that it is only one page out of a 55 page report full of pictures, which itself was only one of many exhibits introduced into evidence at the trial.

{¶41} ODNR next contends that the trial court erred by excluding the proffered testimony of one of its witnesses. Before ODNR rested its case, ODNR conducted the following proffer of evidence.

> **Your honor, if permitted, ODNR would have called Brian Miller who is an ODNR employee. Mr. Miller would have testified about the background of the lake prior to 1997, would testify to what happened after the modifications in 1997. He would have testified to the implementation in 2011 of lake-level management and how that has had a positive impact on flooding in the future and would have testified with respect to other matters.**

(Tr. at 462-63).

{¶42} The trial court responded to ODNR's proffer by saying that "consistent with the court's ruling on the lake-level management minutes and lake-level-logger data identified and proffered as Exhibit 7, the foundation of which would have been that testimony, the court will again renew its ruling to exclude the testimony * * * [.]" (Tr. at 463).

{¶43} The prior ruling the court is referring to, contained the following language.

> **With regard to * * * the lake-level management issue, consistent with the court's prior rulings, the court believes that the Supreme Court of the State of Ohio established that this easement was taken upon the construction in 1997 of the new spillway and lack of lake-level management, and therefore, based thereon determined that a writ of mandamus should be issued to order the State of Ohio to initiate eminent domain proceedings to compensate property owners for the flowage easement taken. It having been taken, although the date for the valuation has been deferred and given to the trial court and the**

**court has ruled consistent with case law that that should be established for the benefit of the property owner at the time of the compensation trial rather than the actual taking, nevertheless the court believes that subsequent lake-level-management issues do not affect the permanency of the take and it's the rights that are taken by the State of Ohio and now are being compensated for through these trial proceedings that is at issue. It is not the use of that easement but rather the effect of the taking upon the valued property. And unless and until it is established that any such remediation efforts by the State of Ohio, whether that would be to construct a new dam or lake-level management or whatever has somehow affected the original take and the extent of the rights taken by the State of Ohio and that matter is litigated, whether it be to the Supreme Court or to another trial court, the court determines that the use of the easement through lake-level management is not relevant to the issue of the value of the take.**

(Tr. at 461-462).

{¶44} Under the circumstances and based upon the trial court's analysis, we cannot find that the trial court abused its discretion in denying ODNR's proffered testimony. However, even if it had been error for the trial court to prevent ODNR's witness from testifying, ODNR is not able to establish any resulting prejudice.

{¶45} Any new lake-level management as of 2011 that resulted in reduced flooding would inherently have been considered by both appraisers when looking at the Knapke farm and the extent to which the flooding would impact the value of the permanent flowage easement. In fact, ODNR's appraisal report specifically stated that "[t]he affects [sic] of the[] flood conditions on the subject [property] are

also included in the value estimate." (Plaintiff's Ex. 1 at 41). As the date of ODNR's appraisal is after the purported 2011 change in lake-level management, this would have been factored into the appraisal and the value of the permanent flowage easement, which was the ultimate (and only) issue for the jury. Therefore ODNR's argument on this issue is not well-taken.

*Jury Instructions*

{¶46} ODNR next contends that the trial court erred by using a particular phrase in one of its jury instructions. The specific instruction objected to is Jury Instruction Number 2, titled "Nature of the Action or Description of Case." It reads as follows.

> **This is an appropriation action brought by [ODNR], to acquire a permanent and perpetual flowage easement across 33.80 acres of the Knapke Trust's approximately 34.5 acre farm located in Liberty Township, Mercer County, Ohio, to grant the State the right to *frequently, severely, and persistently* flood those acres. \* \* \* In this case the permanent and perpetual flowage easement which has been taken is for the increased flooding that occurred and will continue to occur as a natural result of the reconstruction of the western spillway of the Grand Lake in 1997 and lack of lake level management by the Ohio Department of Natural Resources which flooding is intermittent but *frequent*, *severe*, and *persistent*. It has been determined that such intermittent and temporary flooding will inevitably recur with regularity and is greater in frequency, extent, and duration than any flooding that naturally occurred on the Knapke Trust's farm prior to the construction of the 500-foot western spillway in 1997 and lack of lake level management by [ODNR].**

(Emphasis Added.) (Doc. 54).

{¶47} ODNR argues that the phrase "frequent, severe, and persistent," was not a proper jury instruction, and instead should have been replaced by the Ohio Supreme Court's language in the syllabus of the *Doner* decision "intermittent, but inevitably recurring."[3] *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446 (2011), at syllabus. ODNR further contends that not only was the instruction improper but that it was also prejudicial because the language implied that the flooding occurred more often and in greater severity.

{¶48} Initially we would note that while the phrase "intermittent and inevitably recurring" was used in the *Doner* decision by the Ohio Supreme Court and placed in the syllabus, the word "frequent" is used repeatedly in the *Doner* decision to describe the amount of flooding required to constitute a taking. *Doner* at ¶¶ 80-85. Thus we cannot find that the word frequent is improper in the jury instruction leaving us only to determine if the words "severe and persistent" were erroneous and prejudicial.

{¶49} First, the words severe and persistent as used in this jury instruction clearly constituted an accurate description of the trial evidence of the flooding in this case. In terms of severity, the flooding impacted 33.8 out of the 34.5 acres, essentially the entire Knapke farm. The flooding was, at times, testified to be eight to ten feet deep. Testimony as to both of these factors could be described as

---

[3] The syllabus of *Doner* used the wording "the flooding is either a permanent invasion or creates a permanent liability because of intermittent, but inevitably recurring, overflows." *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446 (2011), at syllabus.

evidence of "severe" flooding. As to "persistent," the uncontroverted testimony revealed that flooding had occurred in 7 out of the 10 years the Knapkes had owned the farm. This was qualified by Mark Knapke wherein he testified that the flooding on the farm never lasted more than a few weeks, and was at times only days in duration. Thus the words "severe" and "persistent" both constitute an accurate characterization of the testimony at trial.

{¶50} Second, when looking at this jury instruction in its entirety, there are further qualifying statements that clearly inform the jury as to the nature of the flooding. After the second use of the words in question, the flooding is described as "intermittent and temporary," which will "inevitably recur with regularity." The words are thus clarified using the language desired by ODNR.

{¶51} Third, and finally, we believe it is difficult if not impossible for ODNR to establish *any* prejudice resulting from this jury instruction because ODNR's *own expert* used the very phrasing "frequently, severely, and persistently" to describe the flooding conditions on the Knapke farm *at least* five times in his reports. Additionally, there are multiple other mentions of the terms frequent, and severe (or severity) contained in his reports.

{¶52} Thus, for example under the heading "Property Rights Appraised" Horner's report contains the language "[a] Flowage Easement * * * granting to the State of Ohio the right, during periods of sufficient levels of precipitation, to

-21-

intermittently, frequently, severely, and persistently flood as may occur as a natural result of the reconstruction of the western spillway of the [GLSM]." (Plaintiff's Ex. 1 at 39). Under the heading "Easement Encumbrance," the report contains the same "frequently, severely, and persistently" language just quoted. (*Id*. at 42) On page 3 of ODNR's expert's report the same "frequently, severely, and persistently" language is again used. (*Id*. at 3). On Page 12 the same language is used. (*Id*. at 12). In Horner's updated appraisal report prepared just before trial, the same "frequently, severely, and persistently" language is used. (Plaintiff's Ex. 1A at 4).

{¶53} As a result, while it may have been better practice for the court to simply use the language contained in the syllabus of *Doner* of "intermittent and inevitably recurring," we cannot find that the trial court's use of the words frequent, severe, and persistent was erroneous, or prejudicial in these specific circumstances. Therefore ODNR's arguments as to these issues are not well-taken.

*Cumulative Error*

{¶54} ODNR makes the argument that while none of the errors it assigns to the trial may individually be prejudicial, cumulatively they constitute prejudicial error. In fact, at oral argument, ODNR actually conceded that no single error was likely reversible.

{¶55} At the outset, we would note that the only issue we have actually found to constitute error in this case pertains to the single matter of the headline and photograph of the car accident on one page in Vannatta's report. However, we would also note that Ohio Appellate Courts and Federal Appellate Courts are split on the issue of whether cumulative error should even be applied *at all* in civil cases. In Ohio, the Tenth, Eleventh, and Twelfth Districts have stated that the cumulative error doctrine is not typically applied in civil cases, and those courts have been reluctant to apply it. *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 12AP-999, 2013-Ohio-5140, 138 Ohio St.3d 1468, 2014-Ohio-1674 (appeal not accepted for review) ("this court has previously noted that the cumulative error doctrine is not typically employed in civil cases") citing *Bogdas v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 09AP-466, 2009-Ohio-6327, ¶ 43; Lambert v. Wilkinson, 11th Dist. Ashtabula No. 2007-A-0032, 2008-Ohio-2915, ¶ 110 ("Furthermore, the cumulative error doctrine is generally not applicable in civil cases.") citing Frost v. Snitzer, 11th Dist. Trumbull No. 2005-T-0090, 2006-Ohio-3882, ¶ 107; *Allen v. Summe*, 12th Dist. Butler No. CA92-04-067, 1993 WL 156184 (May 17, 1993) ("This court is somewhat reluctant to apply the cumulative error doctrine in civil cases."). The Second District has wavered back and forth on the application of the cumulative error doctrine to civil cases. *See Ratliff v. Brannum,* 2d Dist. Greene No.2008–CA–05, 2008–Ohio–6732, ¶¶

155–156 (recognizing this wavering, and then finding that resolution of the conflict need not be made in that case as there was not more than one harmless error). Conversely, the First, Seventh and Eighth Districts have affirmatively stated that they would be willing to apply cumulative error doctrine to civil cases. *See Katz v. Enzer*, 29 Ohio App.3d 118, 124, (1st Dist.1985) (actually applying cumulative error); *see Bigler v. Personal Serv. Ins. Co.*, 7th Dist. Belmont No. 12 BE 10, 2014-Ohio-1467, ¶¶ 175-176; *Edge v. Fairview Hosp.,* 8th Dist. Cuyahoga No. 95215, 2011–Ohio–2148.

{¶56} Among Federal Appellate Courts, this issue is similarly undecided. The Third Circuit Court of Appeals has affirmatively stated that it does not apply cumulative error in civil cases. *See U.S. S.E.C. v. Infinity Group Co.,* 212 F.3d 180, 196 (3d Cir.2000). The Fourth, Tenth, and Eleventh Circuits have all indicated that their courts have not affirmatively determined the issue of whether cumulative error applies in civil cases. *See Greig v. Botros*, 525 Fed.Appx. 781, 795 (10th Cir.2013); *Esoteric, LLC v. One (1) 2000 Eighty-Five Foot Azimut Motor Yacht Named M/V STAR ONE*, 478 Fed.Appx. 639 (11th Cir.2012) at fn.3; *Anthony v. Ward*, 336 Fed.Appx. 311, 322 (4th Cir.2009). On the other hand, the Second, Sixth, Seventh, Ninth and Federal Circuits have all stated that they would apply the cumulative error doctrine in civil cases (and some have actually applied it to reverse a judgment). *Malek v. Federal Ins. Co.*, 994 F.2d 49, 55 (2d

Cir.1993); *Kendel v. Local 17-A United Food & Commercial Workers*, 512 Fed.Appx. 472, 485 (6th Cir.2013); *Thompson v. City of Chicago*, 722 F.3d 963, 979 (7th Cir.2013); *Jerden v. Amstutz*, 430 F.3d 1231, 1240-41 (9th Cir.2005); *Hendler v. United States*, 952 F.2d 1364, 1383 (Fed.Cir.1991).

**{¶57}** On the basis of the preceding legal authority there is an argument to be made that cumulative error should not even be applied at all in any civil case, let alone whether it should be applied in this particular instance. However, assuming without finding that cumulative error applies in civil cases, even the potential or assigned errors on their face do not amount to prejudicial error such that ODNR was deprived of a fair trial in this case. In the cases where cumulative error is applied to civil cases, courts have held that merely having multiple errors does not require reversal if those errors still, when taken in context of the entire trial, do not produce an unfair trial. *See Michigan First Credit Union v. Cumis Ins. Soc., Inc*., 641 F.3d 240, 251 (6th Cir.2011).

**{¶58}** In this case the parties both brought in their own expert appraisers to value the flowage easement. The Knapkes' expert valued the flowage easement at $455,200, and ODNR's expert valued the flowage easement at $84,500. The jury returned a verdict valuing the flowage easement at $293,250. Thus the amount

returned was lower than what the Knakpes' appraiser stated and higher than ODNR's, but still well within the range of the two valuations.[4]

{¶59} In determining its valuation, the jury was presented with ample testimony as to extra work caused by the flooding. There was the clear testimony that the crops were completely destroyed in 2003, and Chad Knapke testified that lower yields as a result of the flooding was a serious concern. In addition, Chad Knapke testified that because of the flooding he had to chisel up the ground every year that there was water on the Knapke farm due to soil compaction. Chad also testified that there was up to three feet of debris on the land at times carried by the flood, which included car tires, dead animals and big branches he had to burn or take to a landfill. Chad testified that there was a sewage smell on the land at times. He also testified that during the worst floods the property was inaccessible without trespassing or without a boat. Chad also testified, as did Vannatta, about potential tile blowouts due to the flooding.

{¶60} In sum, in the context of the entire trial, the verdict reached by the jury does not seem to be unreasonable based on the evidence given and based on the fact that the verdict is well within the range of appraisals provided by both parties. Nor can we find when taking in context the entire trial, that ODNR was

---

[4] It is difficult to tell how the jury came up with its award to the Knapkes of $293,250. However, we would note that this amount is extremely close to the number reached using the "before" value proposed by ODNR, $345,600, and the "after" value used by the Knapkes, $50,600, which would have resulted in an award to the Knapkes of $295,000.

deprived of a fair trial simply on the basis of two pictures on one page of a 55 page appraisal report that represented only one of many exhibits entered into evidence by the parties.

{¶61} Accordingly as we have found no prejudicial error in the particulars assigned in ODNR's first, second, and third assignments of error, either individually or cumulatively, the first, second, and third assignments of error are overruled.

{¶62} For the foregoing reasons the judgment of the Mercer County Common Pleas Court is affirmed.

*Judgment Affirmed*

**PRESTON, J., concurs in Judgment Only.**

**/jlr**

**ROGERS, P.J., DISSENTS.**

{¶63} For the reasons stated more fully in the majority opinion of *ODNR v. Ebbing*, 3d Dist. Mercer No. 10-13-24, I must respectfully dissent from the opinion of the majority.

*First Assignment of Error*

{¶64} I believe the clear and unambiguous language of R.C. 163.12 should be followed and that the trial court erred when in arbitrarily denied ODNR's

request for a jury view. In matters of statutory construction, "it is the duty of this court to give effect to the words used, *not delete words used* or insert words not used." (Emphasis added.) *Columbus-Suburban Coach Lines v. Pub. Util. Comm.*, 20 Ohio St.2d 125, 127 (1969); *see also State v. Vanzandt*, Slip Opinion No. 2015-Ohio-236, ¶ 10 (" 'we have repeatedly recognized that use of the term 'shall' in a statute or rule connotes the imposition of a mandatory obligation * * *.' "), quotin*g State v. Golphin*, 81 Ohio St.3d 543, 545-546 (1998). In essence, the trial court deleted the word "shall" from R.C. 163.12 and ignored the clear intent of the General Assembly. Unfortunately, the majority opinion does not correct this mistake, but condones it.

{¶65} Because I believe courts must follow the clear and unambiguous language of the General Assembly, I would sustain ODNR's first assignment of error.

*Second Assignment of Error*

{¶66} I agree with the majority opinion only to the extent that the admission of the photograph of the near drowning girl was prejudicial and should have been excluded from the trial. I must emphasize that I believe that such a photograph has absolutely no relevance to the issue of valuation and was used by the Knapkes solely to enflame the passions of the jury.

{¶67} However, I disagree with the majority opinion that the exclusion of Brian Miller's testimony was proper. As the majority correctly noted, Miller was offered to testify about the general GLSM area and its resumption of lake-level management practices in 2011. While the majority argues that the resumption of lake-level management practices is not relevant to the valuation, I disagree for my reasons stated in the majority opinion of *ODNR v. Ebbing*. I do note that the majority opinion, and the trial court, failed to explain why Miller could not testify as to the general GLSM area. I believe this is prejudicial since the Knapkes were able to present favorable, if not prejudicial evidence, of the surrounding GLSM area. Many of these exhibits were of land that the Knapkes did not own, and land that was not being valued by the jury. The fact that ODNR was denied the ability to present its own evidence about the general GLSM area was prejudicial.

{¶68} Accordingly, I would sustain ODNR's second assignment of error.

*Third Assignment of Error*

{¶69} I concur with the majority's analysis and disposition of ODNR's third assignment of error regarding the jury instructions.

*Cumulative Error*

{¶70} Both the majority opinion and I recognize that there is a split in Ohio and Federal Appellate Courts as to whether it is appropriate to apply cumulative error in a civil case. I believe that some of the errors are prejudicial and reversible

on their own. However, in the alternative, I would apply the cumulative error doctrine to the unique circumstances of this case. The trial court first arbitrarily and erroneously denied ODNR's request for a jury view, despite the clear and unambiguous language of R.C. 163.12 that mandates that the view be granted when requested. It then allowed for the one-sided presentation of evidence. Finally, it allowed the Knapkes to introduce photographs depicting a teenage girl who nearly drowned in her car; photographs that both the majority and I agree are prejudicial and irrelevant.

{¶71} There is no doubt that the ODNR has taken a permanent flowage easement from the Knapkes and that the Knapkes deserve just compensation for the taking. I also agree with the Supreme Court of Ohio that ODNR should try to obtain "[a]n efficient, orderly, and prompt resolution of all of the relators' claims * * *." *State ex rel. Doner v. Zehringer*, 139 Ohio St.3d 314, 2014-Ohio-2102, ¶ 15. However, I cannot sit idly by and watch ODNR be denied a fair trial even if I do not agree with certain litigation tactics of ODNR.

{¶72} For reasons stated more fully in the majority opinion of *ODNR v. Ebbing*, I would reverse the trial court's judgment and remand this matter for further proceedings.