[Cite as *Daniels v. Northcoast Anesthesia Providers, Inc.*, 2018-Ohio-3562.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
EN BANC
**No. 105125**

# VICTORIA DANIELS, ET AL.

PLAINTIFFS-APPELLEES

vs.

# NORTHCOAST ANESTHESIA PROVIDERS, INC., ET AL.

DEFENDANTS-APPELLANTS

## JUDGMENT:
REVERSED AND REMANDED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-11-764060

**BEFORE:** En Banc Court

**RELEASED AND JOURNALIZED:** September 6, 2018

**ATTORNEYS FOR APPELLANTS**

William A. Meadows
Reminger Co., L.P.A.
1400 Midland Building
101 West Prospect Avenue
Cleveland, OH 44115

David H. Krause
Reminger Co., L.P.A.
200 Civic Center Drive, Suite 800
Columbus, OH 43215

Douglas G. Leak
Hanna, Campbell & Powell, L.L.P.
3737 Embassy Parkway, Suite 100
Akron, OH 44333

**ATTORNEYS FOR APPELLEES**

Christopher M. Mellino
Meghan C. Lewallen
Mellino Law Firm, L.L.C.
19704 Center Ridge Road
Rocky River, OH 44116

Paul W. Flowers
Louis E. Grube
Paul W. Flowers Co., L.P.A.
Terminal Tower, Suite 1910
50 Public Square
Cleveland, OH 44113

MELODY J. STEWART, J.:

{¶1} Pursuant to App.R. 26(A)(2), Loc.App.R. 26, and *McFadden v. Cleveland State Univ.*, 120 Ohio St.3d 54, 2008-Ohio-4914, 896 N.E.2d 672, the en banc court has determined that a conflict exists between *Daniels v. Northcoast Anesthesia Providers, Inc.*, 8th Dist. Cuyahoga No. 105125, 2018-Ohio-2132 and *Richlin v. Gooding Amusement Co.*, 113 Ohio App. 99, N.E.2d 505 (8th Dist.1960).[1]  Appellee Daniels frames the question for en banc review as follows:

> Do alleged errors in a civil appeal need to be individually examined for whether sufficient prejudice justifies a reversal, or can the appellate court simply invoke the "cumulative error doctrine" at some point after more than one mistaken ruling has been identified?

**THE EN BANC DECISION:**

{¶2} An extended discussion of the issue certified for en banc review is unnecessary in this case.  *Richlin* rejected the claim that the cumulative effect of a number of minor errors at trial prejudiced a party:

> An error committed by the court in its charge to the jury is either prejudicial or it is not.  There is no legal way to add up the separate effects of such claims so that taken together they may be considered as affecting prejudicially the rights of a contending party.  Each claim of error must be considered as standing or falling on its own facts unassociated with others on different subjects.

*Richlin* at 103.

---

[1] The original announcement of decision, *Daniels v. Northcoast Anesthesia Providers, Inc.*, 8th Dist. Cuyahoga No. 105125, 2018-Ohio-2132, released May 31, 2018, is hereby vacated.  This opinion is the court's journalized decision in this appeal.

**{¶3}** The rationale stated in *Richlin* — that there is no legal way to "add up the separate effects" of various trial errors — predated the Ohio Supreme Court's application of the cumulative error doctrine and can no longer be considered valid. "Under the doctrine of cumulative error, 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.'" *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 321, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223.[2]

**{¶4}** While the Ohio Supreme Court has only applied the cumulative error doctrine in the criminal context, this court has applied the cumulative error doctrine in an unbroken, 30-year line of civil appeals. *See, e.g.*, *O'Malley v. O'Malley*, 8th Dist. Cuyahoga No. 98708, 2013-Ohio-5238, ¶ 95; *Edge v. Fairview Hosp.*, 8th Dist. Cuyahoga No. 95215, 2011-Ohio-2148, ¶ 46; *Dawson v. Cleveland Metro. Gen. Hosp.*, 8th Dist. Cuyahoga Nos. 51052 and 51779, 1986 Ohio App. LEXIS 9169 (Nov. 20, 1986). Other Ohio appellate districts also apply the cumulative error doctrine to civil cases. *See, e.g., Bigler v. Personal Serv. Ins. Co.*, 7th Dist. Belmont No. 12 BE 10, 2014-Ohio-1467, ¶ 175-176; *Katz v. Enzer*, 29 Ohio App.3d 118, 124, 504 N.E.2d 427 (1st Dist.1985).

---

[2] We wish to be clear that the en banc process does not apply to court of appeals cases that have been directly superseded by subsequent Ohio Supreme Court decisions. When application of Supreme Court precedent is indirect, as it is in this case, we proceed en banc out of an abundance of caution, guided by the admonition that "[a]ppellate courts are duty-bound to resolve conflicts within their respective appellate districts through en banc proceedings." *In re J.J.*, 111 Ohio St.3d 205, 2006-Ohio-5484, 855 N.E.2d 851, ¶ 1.

**{¶5}** We are aware that some appellate districts do not apply the cumulative error doctrine to civil cases. *See, e.g., Wolf v. Rothstein*, 2016-Ohio-5441, 61 N.E.3d 1, ¶ 96 (2d Dist.); *J.P. v. T.H.*, 9th Dist. Lorain No. 14CA010715, 2016-Ohio-243, ¶ 35; *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 12AP-999, 2013-Ohio-5140, ¶ 124; *Lambert v. Wilkinson*, 11th Dist. Ashtabula No. 2007-A-0032, 2008-Ohio-2915, ¶ 110. These appellate districts are not, however, emphatic in rejecting the cumulative error doctrine in the civil context because they note that the doctrine is not "typically" or "generally" applicable. *See, e.g., Stanley, supra*, at ¶ 124 ("the cumulative error doctrine is not typically employed in civil cases"); *Lambert, supra* ("the cumulative error doctrine is generally not applicable in civil cases."). In addition, two other appellate districts have not explicitly endorsed the application of the cumulative error doctrine in civil cases, but have rejected assignments of error on the assumption that it applied without actually deciding so. *See, e.g., State, Dept. of Natural Resources v. Mark L. Knapke Revocable Living Trust*, 2015-Ohio-470, 28 N.E.3d 667, ¶ 57 (3d Dist.) (assuming without finding that cumulative error applies in civil cases); *McQueen v. Goldey*, 20 Ohio App.3d 41, 50, 484 N.E.2d 712 (12th Dist.1984) ("Without addressing the relative merits of the cumulative error concept, we conclude that even if we were to accept and apply the concept to a civil case, the accumulation of harmless errors in the case at bar did not constitute prejudicial error.").

**{¶6}** The difference of opinion among appellate districts gives us no reason to depart from more recent precedent in this appellate district. We have not cited *Richlin* as

support for rejecting the application of the cumulative error doctrine in civil cases for over 50 years. *See Nicholas v. Yellow Cab Co.*, 116 Ohio App. 402, 412, 180 N.E.2d 279 (8th Dist.1962) ("Any error shown upon the record must stand or fall on its own merits and is not aided by the accumulative effect of other claims of error. The court has recently passed on this question in the case of *Richlin v. Gooding Amusement Co., Inc.*, 113 Ohio App. 99."). We hold that the cumulative error doctrine can be applied to civil appeals. *Richlin* and *Nicholas* are overruled to the extent that they are inconsistent with this opinion.

_____
MELODY J. STEWART, JUDGE

PATRICIA ANN BLACKMON, MARY J. BOYLE, FRANK D. CELEBREZZE, JR., EILEEN A. GALLAGHER, A.J., EILEEN T. GALLAGHER, SEAN C. GALLAGHER, LARRY A. JONES, SR., KATHLEEN ANN KEOUGH, MARY EILEEN KILBANE, and ANITA LASTER MAYS, JJ., CONCUR

TIM McCORMACK, J., RECUSED

**THE DECISION OF THE MERIT PANEL:**

MELODY J. STEWART, J.:

{¶7}   As plaintiff-appellee Victoria Daniels was about to have surgery, the defendant-appellant-anesthesiologists Zoard Vasarhelyi, M.D. and Rostyslav Koziy, M.D., approved the placement of a transdermal patch on her to prevent postoperative nausea.   Daniels appeared to have an allergic reaction to the patch and went into anaphylactic shock.   She stopped breathing and experienced low blood oxygen for close to 30 minutes, causing her to suffer brain damage.   Alleging that the active ingredient in the transdermal patch was part of the same family of drugs to which she had previously disclosed a serious allergic reaction, Daniels brought this medical malpractice action against both physicians and their employer, defendant-appellant Northcoast Anesthesia Providers, Inc., claiming that they violated the standard of care by failing to formulate an anesthesia plan to prevent her from being given drugs belonging to the same class of drugs to which she had an established allergy.[3]   She also alleged that the physicians violated the standard of care in failing to give her adequate doses of a drug called "Epinephrine" to resuscitate her.   A jury found in Daniels's favor and awarded damages.  The court subsequently awarded her prejudgment interest on the damages award.

---

[3] Daniels's two minor children were also named as plaintiffs and sought damages for loss of parental care and comfort.   Because the claims of the minor children are derivative of any relief that Daniels obtained, we shall collectively refer to the plaintiffs as "Daniels."

**{¶8}** The ten assignments of error on appeal contest various pretrial and trial rulings by the court, as well as an award of prejudgment interest. We conclude that the court abused its discretion by admitting Daniels's summary of the medical records evidence to go to the jury; that the court abused its discretion by not giving the "bad results" instruction to the jury; and that the court abused its discretion by allowing Daniels's demonstrative boards to be considered by the jury. We further find that the cumulative effect of these errors deprived Vasarhelyi and Koziy of a fair trial. The assignments of error relating to the limitation on closing argument and prejudgment interest are moot.

## I. Hearsay

**{¶9}** The first assignment of error is that the court abused its discretion by admitting into evidence, and sending to the jury for its deliberations, a learned treatise in violation of Evid.R. 803(18).

**{¶10}** The basis of Daniels's claims against Vasarhelyi and Koziy was that prior to surgery, she disclosed an allergy to an asthma medication called Atrovent. She maintained that the antinausea patch placed on her prior to surgery contained a drug called Scopolamine and that Scopolamine and Atrovent belong to the same family of drugs known as "belladonna alkaloids." She maintained that the allergic reaction to Scopolamine could have been prevented had Vasarhelyi and Koziy cross-checked the drug using, among other resources, an online service called Lexi-Comp that provides drug information such as dosing, warnings, and precautions.

**{¶11}** Daniels's expert testified at trial that there were a variety of resources that doctors and nurses could consult about drugs, including Lexi-Comp. The expert identified plaintiff's exhibit No. 26 as a printout from Lexi-Comp titled "Belladonna Alkaloid Allergy." The printout contained a list of "associated drugs" including Scopolamine. According to Daniels's expert, the printout showed that Scopolomine "could potentially crossreact in that category." The expert said that the Lexi-Comp entry "instructs to avoid scopolamine, which was in the patch; it talks about Atrovent * * *." The expert then identified a second printout from Lexi-Comp, plaintiff's exhibit No. 26B, titled, "Reported Allergy: Patient Management Considerations." The expert testified that the printout stated: "In general, when a previous severe reaction has occurred, repeated exposure to the initial agent and related compounds should be avoided. * * * Per the manufacturer's labeling, use is normally contraindicated in patients with prior allergic reactions."

**{¶12}** "Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Statements in a "learned treatise" established as reliable authority are not excluded by the hearsay rule. *See* Evid.R. 803(18). However, Evid.R. 803(18) states that "[i]f admitted, the statements may be read into evidence but may not be received as exhibits."

**{¶13}** Daniels stated at trial that she laid a foundation for exhibit No. 26B as a learned treatise and told the court that the exhibit should not be allowed into evidence.

Despite Daniels agreeing that exhibit No. 26B should be withdrawn, the court inexplicably submitted it to the jury. This was an error. With Daniels having conceded that the document was a learned treatise, the court violated Evid.R. 803(18). *See Moretz v. Muakkassa*, 137 Ohio St.3d 171, 2013-Ohio-4656, 998 N.E.2d 479, ¶ 56 (stating that materials subject to the learned treatise hearsay rule "shall not be admitted into evidence as an exhibit over the objection of a party.").

{¶14} Daniels sought the admission of exhibit No. 26 by arguing that it was admissible as a resource available to physicians, presumably under Evid.R. 803(17), which excepts from the hearsay rule "[m]arket quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations."

{¶15} Lexi-Comp appears to be similar to the Physician's Desk Reference ("PDR")[4] in that it can be consulted to ascertain potential drug cross-reactivity. Several courts have refused to admit the PDR and similar materials into evidence under rules similar to Evid.R. 803(17). *See, e.g., Aurora v. Kepley*, 11th Dist. Portage No. 801, 1978 Ohio App. LEXIS 9115, at 4 (Sep. 5, 1978) (PDR inadmissible as hearsay "due to the inexact and ever-changing nature of medicine"); *Garvey v. O'Donoghue*, 530 A.2d 1141 (D.C.1987) (PDR inadmissible under Fed.R.Evid. 803(17) because the publication contains not only factual statements, but also "directions, opinions, suggestions, and

---

[4] The PDR is an annual publication compiling "medications, monographs, and FDA approval limitations." *United States v. Ignasiak*, 667 F.3d 1217, 1227 (11th Cir.2012).

recommendations"); *Kahanek v. Rogers*, 12 S.W.3d 501, 504 (Tex. App. 1999) (PDR inadmissible under market reports exception because the publication "goes beyond objective information to items on which learned professionals could disagree in good faith"); *In re Richardson-Merrell, Inc. Bendectin Prods. Liab. Litigation*, 624 F.Supp. 1212, 1232 (S.D. Ohio 1985) (PDR did not fall within the commercial publications exception of Fed.R.Evid. 803(17)), *aff'd*, 857 F.2d 290 (6th Cir. 1988). *But see SK&F Co. v. Premo Pharmaceutical, Laboratories, Inc.*, 481 F.Supp. 1184, 1189 (D.N.J.1979) (taking judicial notice that the PDR falls within Fed.R.Evid. 803(17) as "a published compilation generally used and relied on by physicians and pharmacists").

**{¶16}** Despite these courts refusing to allow materials like the PDR into evidence under their equivalent of Evid.R. 803(17), we find that the prerequisites for admission were established in this case. Evid.R. 803(17) is patterned after Fed.R.Evid. 803(17). The predicate for admission under the federal rule of evidence is similar to other hearsay exceptions: necessity and reliability. *United States v. Woods*, 321 F.3d 361, 364 (3d Cir.2003), citing 5 *Weinstein's Federal Evidence* Section 803.19[1] (Matthew Bender 2002). With respect to "reliability," publications like Lexi-Comp "know that their work will be consulted; if it is inaccurate, the public or the trade will cease consulting their product." *Id*. In other words, the success of the service depends on its reputation for accuracy, thus ensuring its reliability for purposes of Evid.R. 803(17).[5]

---

[5]Although the "necessity" prong for admission of hearsay is often stated in terms of a witness's unavailability, *State v. Howard*, 2d Dist. Montgomery No. 19413, 2003-Ohio-3235, ¶ 32, learned treatises can be admitted on the basis of "economic or practical necessity." *State v. Alger*,

{¶17} Daniels's expert testified without contradiction that physicians rely on materials like Lexi-Comp and the PDR. Exhibit No. 26 listed Scopolamine as an "associated" drug under the heading "belladonna alkaloid allergy." That factual assertion has not been challenged as false or misleading. In fact, it may have been largely cumulative given the number of witnesses who agreed that Scopolamine was contraindicated for patients who were hypersensitive to Atrovent or other belladonna alkaloids. While the court may not have expressly indicated that it was allowing exhibit No. 26 into evidence under Evid.R. 803(17), it did indicate that the exhibit was "an informational cite," a characterization consistent with it being a tabulation or list relied upon by medical professionals. The court did not err by allowing exhibit No. 26 into evidence.

## II. Closing Argument

{¶18} The second assignment of error complains that the court erred by prohibiting Vasarhelyi and Koziy's counsel from referencing in closing argument a July 2004 emergency room treatment that predated the events leading to this case. This assigned error is rendered moot based on our decision to reverse and remand the case. *See* App.R. 12(A)(1)(c).

## III. FDA Adverse Event Reporting System

---

115 Idaho 42, 49, 764 P.2d 119 (App.1988); *Loven v. State*, 831 S.W.2d 387, 395 (Tex.App.1992) ("Similarly, there is no longer any reason to believe that evidence contained in a learned treatise is inferior to live testimony by the author of the treatise."). Vasarhelyi and Koziy did not question the necessity of Daniels's use of the Lexi-Comp materials, so we consider necessity established.

{¶19} Vasarhelyi and Koziy filed a motion in limine to bar Daniels from using at trial a Food and Drug Administration ("FDA") adverse event report, identified at trial as plaintiff's exhibit No. 12. They maintained that the FDA report, which reported 471 cases of adverse events caused by Scopolamine use, did not include Daniels's case as an "event" and was not probative on the issue of whether they breached the standard of care. The court denied the motion in limine subject to revision at trial. The court allowed questioning on the adverse event report over objection by Vasarhelyi and Koziy, but it did not allow the report to be admitted into evidence.

{¶20} "Courts have broad discretion in ruling on the admissibility of evidence, and the granting of a motion in limine rests within the sound discretion of the trial court." *Bennett v. Admr., Ohio Bur. of Workers' Comp.*, 134 Ohio St.3d 329, 2012-Ohio-5639, 982 N.E.2d 666, ¶ 52. In this context, admissibility is predicated on relevancy; that is, does the evidence have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Even if relevant, evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

{¶21} "Federal regulations require drug manufacturers to report '[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related' to the FDA." *Utts v. Bristol-Myers Squibb Co.*, S.D.N.Y. No. 16cv5668(DLC), 2017 U.S. Dist. LEXIS 70317, 31 (May 8, 2017), quoting 21 C.F.R. Section 314.80(a),

(c).  But reporting of adverse events is not limited to drug manufacturers: "Anyone can submit an adverse event report, including drug manufacturers, doctors, and individual patients."  *Drake v. Allergan, Inc.*, 111 F. Supp.3d 562, 565 (D.Vt.2015).  The FDA makes it clear that it "does not require that a causal relationship between a product and event be proven, and reports do not always contain enough detail to properly evaluate an event."  *Utts, supra.*  "The fact that a user of a drug has suffered an adverse event, standing alone, does not mean that the drug caused that event."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011).

{¶22} The fact that an adverse event report specifically does not establish a causal relationship between a drug and an event does not mean that the report had no probative value.  "A lack of statistically significant data does not mean that medical experts have no reliable basis for inferring a causal link between a drug and adverse events."  *Id*. at 40.  An adverse event might be considered significant depending on a variety of factors like the "strength of the association," the "temporal relationship of product use and the event," and the "seriousness of the event relative to the disease being treated."  *Id*. at 41.

{¶23} We agree that the court did not abuse its discretion by denying the motion in limine.  It was conceivable, in the pretrial motion stage, that Daniels could establish a basis for admission of the adverse event report at trial.  As it happened, she did not — none of the factors that might have shown causation or significance were mentioned at trial.  Daniels's expert testified that the FDA monitors the use of drugs to ensure that adverse drug reactions are reported.  The expert said that the FDA collects the data to

both inform drug manufacturers that the drug might pose a danger and "to communicate to the healthcare providers not to administer that drug if they see a pattern of potentially danger [sic] with a drug." Daniels then asked the expert to identify the adverse event report, which the expert described as "the first page of the FDA website for adverse event reporting." With respect to Scopolamine, the expert identified a section of the adverse effect report, "which you can see is about an inch thick," listing adverse events from the drug.

{¶24} This testimony did not take into account how many of the 471 reported instances actually involved a direct reaction to Scopolamine as opposed to some other cause. This tenuous connection created the possibility that the jury would give undue weight to the adverse event report, particularly when the report contained just one relevant instance of anaphylactic shock associated with the usage of Scopolamine. The report was properly excluded from evidence because its prejudicial effect substantially outweighed its probative value. That the report was later excluded from the evidence does not mean that the court erred by denying the motion in limine and allowing testimony on the report subject to exclusion.

IV. Summary of Medical Records

{¶25} Daniels offered the report of a nurse who summarized Daniels's medical records. Vasarhelyi and Koziy filed a motion in limine to exclude the nurse from testifying on grounds that the summary of medical records went beyond what was allowed under Evid.R. 1006 and that the summary contained expert opinion that had not been

disclosed as required by Loc.R. 21.1.  The court denied the motion in limine (it ordered Daniels to strike a two-sentence paragraph at the end of the summary), allowed the nurse to testify to matters contained in her report, and later admitted both the summary and medical records into evidence.

{¶26} "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  Evid.R. 1006.  This is a rule of convenience based on practical necessity.  *See* Notes of Advisory Committee on Proposed Fed.R.Evid. 1006 (construing identical federal rule).  Because the summary itself is admitted in lieu of the voluminous evidence, the jury is entitled to consider the summary in its deliberations and base a verdict on it.

{¶27} Fed.R.Evid. 1006, which is functionally identical to Evid.R. 1006, does not generally permit both a summary of the voluminous evidence and voluminous evidence to be admitted into evidence.  *See, e.g., United States v. Whitfield*, 590 F.3d 325, 364 (5th Cir. 2009) (court should avoid the use of a summary of previously admitted evidence to simply repeat entire case shortly before jury deliberations).  If the purpose of the rule is to avoid having to introduce certain voluminous writings by allowing the introduction of a summary as proof of the content of voluminous writings where those writings "cannot be conveniently examined," *see United States v. Janati*, 374, 396 (4th Cir. 2004), then under the rule, the summary itself is the evidence admitted as proof of the content of the writings or other material summarized.

**{¶28}** Some Ohio cases state the proposition that "for a summary to be admissible, the documents on which it was based must be admitted or offered into evidence or their absence explained." *Eysoldt v. Imaging*, 194 Ohio App.3d 630, 2011-Ohio-2359, 957 N.E.2d 780, ¶ 34 (1st Dist.); *Hornsby v. Gosser*, 12th Dist. Warren No. CA2013-12-134, 2015-Ohio-162, ¶ 14.

**{¶29}** These cases appear to confuse admissibility under Evid.R. 1006 with the original document or "best evidence" rule of Evid.R. 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio." ). Courts interpreting Fed.R.Evid. 1006 recognize that the rule is an exception to the best evidence rule. *United States v. Weaver*, 350 U.S.App.D.C. 121, 281 F.3d 228, 232 (2002); *Martin v. Funtime, Inc.*, 963 F.2d 110, 115 (6th Cir.1992); *United States v. Ashford*, 924 F.2d 1416, 1422 (7th Cir.1991).

**{¶30}** To be sure, a summary of voluminous evidence is not automatically admissible — the evidence on which the summary is based must itself meet all criteria for admissibility. *United States v. Johnson*, 594 F.2d 1253, 1256 (9th Cir.1979) ("Commentators and other courts have agreed that Rule 1006 requires that the proponent of the summary establish that the underlying documents are admissible in evidence."); *United States v. Scales*, 594 F.2d 558, 562 (6th Cir.1979) ("If the records themselves could have been admitted to show what their contents did not include, there appears to be

no reason why Rule 1006 would not apply to a summary of their contents."). There is no question that the medical records on which the summary in this case was based were admissible as medical records under the Evid.R. 803(4) hearsay exception.

{¶31} We find the federal authority persuasive — there is no requirement that the evidence on which the summaries are based *must* also be produced at trial. However, Evid.R. 1006 does not bar the trial judge from admitting the actual records into evidence — the rule plainly states that "[t]he court may order that [the originals] be produced in court." *United States v. Lemire*, 720 F.2d 1327, 1347 (D.C.Cir.1983); *United States v. Milkiewicz*, 470 F.3d 390, 397 (1st Cir.2006). The court had the discretion to admit the original medical records along with the summary of those medical records.

{¶32} The court in this case abused its discretion, however, by admitting into evidence a summary of medical records that contained the opinions of the person summarizing the evidence.

{¶33} To be admissible under Evid.R. 1006, a summary must fairly condense the voluminous material and do so without embellishment. *Gomez v. Great Lakes Steel, Natl. Steel Corp.*, 803 F.2d 250, 258 (6th Cir.1986) (criticizing admission of a summary that was "more akin to argument than evidence"); *United States v. Drougas*, 748 F.2d 8, 25 (1st Cir.1984) (summaries with information "not present" in the underlying records deemed inadmissible). At bottom, because summaries are admitted as evidence in lieu of the records themselves, they must be both "accurate and nonprejudicial." *United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir.1998).

**{¶34}** The summary offered by Daniels was not an accurate representation of her medical records. In fact, the summary was more in the nature of an annotation than a summary. The nurse provided explanations for medical terms, procedures and devices, and she included numerous "exhibits" not contained in the medical records that depicted body parts, medical equipment, and illustrations of medical procedures. These annotations went beyond what the documents themselves contained and were thus impermissible embellishment.

**{¶35}** At various points the nurse offered her own "notes" to highlight the content of certain records. For example, she made the following notation regarding a nursing note: "(NOTE: this note was timed as 0800 [8:00 AM] although it was part of the note written at 1300 [1:00 PM].)" By doing so, the nurse went beyond what the record stated. In another example, the nurse commented on the amount of Fentanyl administered to Daniels before her surgery:

> At 7:35 AM, Ms. Daniels received Ancef 1 gm IV (antibiotic), Versed 2 mg, and Fentanyl 100 *mg*. (Fentanyl is a very potent narcotic analgesic. A dose of 100 *mcg* [or 0.1 mg] of Fentanyl is the equivalent of about 10 mg of Morphine. 100 mg would be an enormous dose of Fentanyl.)

**{¶36}** The nurse injected her own opinions into the summary. When summarizing a record that showed Daniels's oxygen saturation level as "hovering in the 40s," the nurse included a parenthetical stating that "[n]ormal oxygen saturation is usually 95% or above; 40% is extremely low." When summarizing a postoperative record showing the amount of urine drained from Daniels, the nurse parenthetically stated that "This is a massive amount of urine." When summarizing a postoperative record of Daniels's weight, the

nurse stated, "(Ms. Daniels weighed 163 pounds on the day of her laparoscopy. This would mean that in two days, Ms. Daniels gained 88 pounds!)"

{¶37} In going beyond summarizing the medical records themselves, the nurse offered additional information that was prejudicial to Vasarhelyi and Koziy. The nurse italicized nearly every portion of the summary in which the records showed that Daniels disclosed an allergy to Atrovent prior to her surgery. When summarizing a record of postoperative care, the nurse stated: "The nurses also suctioned Ms. Daniels; breathing tube multiple times. (This can be very uncomfortable. It can cause gagging and coughing, and a sensation of being unable to catch your breath.)." When summarizing a record showing that Daniels was given pain medication and offered "reassurance" in the form of "holding pt's hand," the nurse included a parenthetical stating, "This must have been a very frightening time for Ms. Daniels." The nurse stated that "Ms. Daniels' complex care went on all day, every day; throughout the night, every night. Her sleep was constantly interrupted." When describing a record showing that Daniels had been placed on an ECMO (extra corporeal membrane oxygenation) machine, the nurse wrote in bold type that "**Ms. Daniels' life was now literally dependent on the staff and a machine**." (Emphasis sic.)

{¶38} None of this was admissible under Evid.R. 1006 because the addition of the nurse's commentary went beyond summarizing the medical records. And the prejudicial effect was obvious: the nurse's commentary would no doubt engender sympathy for Daniels.

**{¶39}** Daniels implicitly concedes prejudice by stating that she offered the nurse as a witness on pain and suffering, presumably meaning that the commentary in the summary was designed to portray the medical records in a light most favorable to that end. But by doing so, the nurse went well beyond what is acceptable for a summary of voluminous evidence under Evid.R. 1006. And other parts of the summary — notably the numerous italicized portions that emphasized how Daniels disclosed an allergy to Atrovent — could only be viewed as attempting to assist Daniels in establishing liability on the medical malpractice claim. This was far outside what is permissible under the rule.

**{¶40}** Daniels maintains that any error in admitting the summary was harmless because the court also sent the actual medical records for comparison purposes. Because the summary was allowed as substantive evidence in lieu of the actual medical records, the jury in all likelihood considered the summary to the exclusion of the actual medical records. Would there be any doubt that if the court admitted both the novel *War and Peace* and the Cliff Notes version of that novel into evidence, the jury would read the Cliff Notes? Daniels even conceded in arguing for the admission of the summary that the medical records consisted of "thousands of pages of medical records" and that "[t]o ask a juror to examine and fully understand a set of such complicated medical records is virtually an impossible task[.]" We have no confidence that the jury, with a 30-page summary of the medical records and the actual medical records numbering in the

"thousands," actually compared the summary against the medical records. The court's error in admitting the summary of the medical records was prejudicial.

## V. Jury Instructions

{¶41} The court, over objection, gave the jury an "eggshell skull" instruction, telling the jury that "if you find that Victoria Daniels had a predisposition that made her more susceptible to injury" the defendants were nevertheless liable for her actual injuries and damages. Vasarhelyi and Koziy argue that the court gave this instruction in error because neither party suggested that Daniels suffered any greater injury due to her frailty or that a person of greater strength would have been injured less under the circumstances.

{¶42} The "eggshell skull" or "thin skull" doctrine evolved in the context of preexisting injuries to provide that if a defendant's wrongful act causes injury, the defendant is fully liable for the resulting damage even though the injured plaintiff had a preexisting condition that made the consequences of the wrongful act more severe than they would have been for a plaintiff without a preexisting condition or injuries. *See generally* Calandrillo & Buehler, *Eggshell Economics: A Revolutionary Approach to the Eggshell Plaintiff Rule*, 74 Ohio St. L.J. 375, 380 (2013).

{¶43} A tortfeasor is fully liable for any damages resulting from its wrongful act even if the victim had a preexisting condition that made the consequences of the wrongful act more severe for him than they would have been for a person without the condition. *Meyers v. Wal-Mart Stores, E., Inc.*, 257 F.3d 625, 632 (6th Cir. 2001); *Figueroa-Torres v. Toledo-Davila*, 232 F.3d 270, 275-276 (1st Cir. 2000); *Jordan v. Atchison, Topeka &*

*Santa Fe Ry. Co.*, 934 F.2d 225, 228-229 (9th Cir. 1991). While it is a truism that the tortfeasor "takes his victim as he finds him," *Binns v. Fredendall*, 32 Ohio St.3d 244, 246, 513 N.E.2d 278 (1987), the eggshell skull rule states only that the tortfeasor may not escape or reduce liability because the victim's preexisting condition made the victim more susceptible of injury from the tortfeasor's conduct.

**{¶44}** Our review of the record satisfies us that there was sufficient evidence to support the court's decision to give the eggshell skull instruction. *Niskanen v. Giant Eagle, Inc*., 122 Ohio St.3d 486, 2009-Ohio-3626, 912 N.E.2d 595, ¶ 22. Daniels offered the testimony of a medical doctor specializing in physical medicine and rehabilitation who testified that Daniels suffered from migraine headaches before suffering hypoxia (oxygen deficiency) as a result of going into anaphylactic shock. The expert testified that those migraines "are much more common since she had the brain injury." The physician also testified that Daniels suffered from depression prior to going into anaphylactic shock and that "if you already have problems with depression and anxiety, having hypoxic brain injury makes it that much worse."

**{¶45}** Vasarhelyi and Koziy next argue that the court erred by refusing to give a "bad result" jury instruction. That instruction states that "'[t]he fact that a doctor's treatment did not bring about a cure does not by itself prove that the doctor was negligent.'" *Hinkle v. Cleveland Clinic Found*., 159 Ohio App.3d 351, 2004-Ohio-6853, 823 N.E.2d 945, ¶ 86 (8th Dist.), quoting Ohio Jury Instructions 331.01(6).

{¶46} The "bad result" or "no guarantee" instruction recognizes that unsatisfactory results from treatment or care alone do not determine whether the defendant was negligent in treating the plaintiff. In other words, a bad outcome alone does not determine whether the applicable standard of care has been met. The instruction thus recognizes a fundamental precept of tort law that the mere occurrence of an injury or accident, in and of itself, does not mean that the injury was the result of negligence. *Laughlin v. Cleveland*, 168 Ohio St. 576, 577, 156 N.E.2d 827 (1959), paragraph two of the syllabus.

{¶47} Daniels argues that a "bad results" instruction was unwarranted because she did not plead a cause of action against Vasarhelyi and Koziy for breach of personal satisfaction of contract, breach of express warranty, or lack of informed consent. This argument misapprehends the nature of the "bad results" jury instruction. The issue at trial was whether Vasarhelyi and Koziy breached the applicable standard of care. The instruction would have made it clear that the mere fact that there was a bad result in Daniels's treatment did not, by itself, prove that malpractice occurred.

{¶48} Jury instructions "must be given when they are correct, pertinent, and timely presented." *State v. Joy*, 74 Ohio St.3d 178, 181, 657 N.E.2d 503 (1995), citing *Cincinnati v. Epperson*, 20 Ohio St.2d 59, 253 N.E.2d 785 (1969), paragraph one of the syllabus. Because medical malpractice cannot be based solely on the fact that the plaintiff suffered an adverse result, there was no reason for the court to refuse the requested instruction. The court erred by doing so.

## VI. News Video

{¶49} Less than one month after the anaphylactic reaction, one of the nondefendant doctors who participated in reviving Daniels was interviewed in a local television newscast. That video apparently showed Daniels, and Vasarhelyi and Koziy wished to introduce a clip of the video, without accompanying audio, to counter Daniels's use of photographs to depict the condition of her body in the weeks following her going into shock. Daniels filed a motion in limine to exclude the video on grounds that Vasarhelyi and Koziy did not timely produce the video in discovery, that the video was hearsay, and that it was unduly prejudicial because it made a nonparty doctor to the case look like "a hero." The court found the motion in limine moot,[6] excluded the video, and it was proffered into evidence.

{¶50} Daniels argues that Vasarhelyi and Koziy did not properly authenticate or verify the trustworthiness of the video. If the court excluded the proffered video for want of authentication, this writer is of the opinion that the court erred by doing so. Authentication is merely a means of proving that something is what its proponent claims it to be. *See* Evid.R. 901(A). With respect to video, we have held that under Evid.R. 901(B)(4), which permits authentication based on distinctive appearance, contents, or substance, that "[t]he distinctive characteristics of the videotaped news report are

---

[6] It is unclear why the court found the motion in limine moot. The motion might be rendered moot if Daniels chose not to introduce photographs of her physical condition, thus making it unnecessary for Vasarhelyi and Koziy to offer the video in rebuttal. However, neither party argues that this happened, nor do they give any indication why the court found the motion in limine to be moot.

sufficient evidence" to support a finding that the news report was what the proponent claimed it to be. *Skelly Beauty Academy, Inc. v. Columbia Gas of Ohio, Inc.*, 8th Dist. Cuyahoga Nos. 58597, 58598, 58599 and 58600, 1991 Ohio App. LEXIS 4235, 12 (Aug. 29, 1991). Vasarhelyi and Koziy offered the video to show Daniels in the period following her going into shock, for the purpose of rebutting photographs that Daniels used to depict her physical condition during the same time period. At no time did Daniels suggest that she was not the person shown in the newscast, nor has she suggested that the video Vasarhelyi and Koziy wished to play to the jury was not a fair depiction of what had been broadcast during the news segment.

{¶51} To support her motion in limine, Daniels cited *State v. Mays*, 108 Ohio App.3d 598, 671 N.E.2d 553, 568 (8th Dist.1995), for the proposition that newscasts are unreliable hearsay and should be excluded from evidence. *Mays* is not on point. Mays, a medical doctor, was found guilty of fraudulently billing county welfare agencies for oral surgeries he did not perform. Mays wanted to introduce into evidence excerpts from a series of television news stories relating to welfare fraud that aired three years after his crimes were committed. The newscast included interviews with persons unrelated to the charges against Mays, and the trial judge excluded the newscast because it was not evidence on the theft charge and because those interviewed for the newscast could not be cross-examined. We found that video to be "rank hearsay as well as irrelevant and confusing." *Id.* at 568.

**{¶52}** In this case, the newscast would be played with no audio, so it would not have contained any statements offered for the truth of the matter asserted. The newscast was being offered as demonstrative evidence for the very limited purpose of rebutting photographs that Daniels planned to introduce for the purpose of showing her condition in the weeks following anaphylaxis. There was nothing confusing about the video or its purpose.

**{¶53}** Daniels also maintained that Vasarhelyi and Koziy waited too long to inform her that they intended to use the newscast — offering it only five days before trial and six days after the court's deadline for motions in limine. The trial court may have properly excluded the video for this reason, however, we need not address this aspect of the issue based on the decision to reverse the case. There is no majority decision reached on the resolution of this assignment of error.

### VII. Life Care Plan

**{¶54}** Daniels offered the testimony of a nurse who prepared a life care plan as part of Daniels's claim for future monetary damages. Although the nurse reduced her calculation of future damages to its present value, Vasarhelyi and Koziy maintain that Daniels had to provide expert testimony to reduce the monetary damage to present day value. They maintain that the nurse had not been identified as an expert as required by Loc.R. 21.1, so the reduction could not have been made to a requisite degree of certainty and would be the product of speculation.

{¶55} "In Ohio, a plaintiff is entitled to an award of damages to compensate him for losses which he is reasonably certain to incur in the future." *Galayda v. Lake Hosp. Sys.*, 71 Ohio St.3d 421, 425, 644 N.E.2d 298 (1994). Those future damages are often set forth in what is called a "life care plan." The typical life care plan details the life-time costs of all future medical care resulting from the tortfeasor's acts that is reasonably certain to occur in the future. But as with all future damages, the cost of a life care plan must be reduced to present value of those actual damages. *Id.*

{¶56} "Expert testimony is not required to entitle a plaintiff to recover future earnings." *Sahrbacker v. Lucerne Prods., Inc.*, 52 Ohio St.3d 179, 179, 556 N.E.2d 497 (1990).

{¶57} Vasarhelyi and Koziy acknowledge *Sahrbacker*, but claim that it is distinguishable from this case and does not prevent us from finding that expert testimony is required to reduce to present value any future award. They maintain that *Sahrbacker* addressed a contract claim that, unlike the medical malpractice claim in this case, did not require the jury to establish damages to a reasonable degree of medical certainty. Their attempt to distinguish *Sahrbacker* fails — courts have long-held that "[i]n order for a plaintiff to recover lost profits in a breach of contract action, the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, 66, 521 N.E.2d 814 (1988). *See also Gateway Consultants Group, Inc. v. Premier Physicians Ctrs., Inc.*, 8th Dist. Cuyahoga No. 104014, 2017-Ohio-1443, ¶ 8 (damages in a breach of contract action must

be shown with certainty); *Chuang Dev. L.L.C. v. Raina*, 10th Dist. Franklin Nos. 15AP-1062 and 16AP-500, 2017-Ohio-3000, ¶ 73 ("A plaintiff must establish their entitlement to damages under a contract with reasonable certainty, and such damages may not be based on mere speculation or conjecture."). The reasonable certainty standard applied to damages in a medical malpractice case is the same standard as that applied in a contract case like *Sahrbacker*. Consistent with *Sahrbacker*, Daniels did not have to offer expert testimony reducing the life care plan to present value.

{¶58} Vasarhelyi and Koziy also argue that the court abused its discretion by refusing to bar Daniels from offering the nurse as an expert because Daniels did not timely identify the nurse as an expert witness under Loc.R. 21.1. We need not address this issue in light of our disposition of the case.

{¶59} Finally, Vasarhelyi and Koziy maintain that the court erred by allowing the jury to view a copy of the life care plan during its deliberations. They maintain that the life care plan was prejudicially cumulative and repetitive to the nurse's testimony. We reject this assertion because the life care plan consisted of charts that were admitted into evidence after the nurse discussed the life care plan during her testimony. Vasarhelyi and Koziy did not offer their own cost estimate of a life care plan for Daniels, nor did they cross-examine the nurse on the substance of her calculations. We thus have no basis for finding that the jury was unfairly influenced by the court's decision to admit the life care plan into evidence and allow it to go the jury room during deliberations.

VIII. Demonstrative Boards

{¶60} One of Daniels's experts testified with the aid of a demonstrative chart titled "Harms and Losses." The chart described 30 different "limitations" caused by the alleged malpractice, such as "migraines, headaches, accompanied by loss of vision." Next to the particular limitation was a checkmark indicating whether the particular limitation was "Frequent" or "Always." Over objection, the court admitted the chart into evidence and allowed it to go the jury. Vasarhelyi and Koziy complain that by allowing the chart to go to the jury, the court influenced the jury by allowing it to place more emphasis on what was repetitive to the expert's trial testimony.

{¶61} There is a distinction between summaries of evidence allowed by Evid.R. 1006 and pedagogical devices that organize evidence for the aid of the jury. *Kinn v. HCR ManorCare*, 2013-Ohio-4086, 998 N.E.2d 852, ¶ 79 (6th Dist.). Pedagogical (sometimes called "demonstrative" or "illustrative") devices make it easier for the jury to visualize evidence, a "development we do not wish to discourage so long as there is no unfair surprise." *Cherovsky v. St. Luke's Hosp.*, 8th Dist. Cuyahoga No. 68326, 1995 Ohio App. LEXIS 5530, 35 (Dec. 14, 1995).

{¶62} Unlike summaries of evidence allowed by Evid.R. 1006, pedagogical devices are not evidence, but "more akin to argument than evidence." *Kinn, supra*. The presence of a chart in the jury room might cause the jury to believe that the chart itself, as opposed to the testimony of the witness who prepared the chart, constitutes the actual evidence. There is also the possibility that the jury might rely on the summarized information as a substitute for assessing the credibility of the witness who prepared the

chart. For this reason, a pedagogical device should not be allowed into the jury room unless all parties consent, and even then, the pedagogical device should be accompanied by a limiting instruction that the device is not evidence. *Id.*, citing *United States v. Munar*, 419 Fed.Appx. 600, 608 (6th Cir.2011) and *Gomez*, 803 F.2d 250 at 257-259. *See also Lucitte v. Lucitte (In re Estate of Lucitte)*, 6th Dist. Lucas No. L-10-1136, 2012-Ohio-390, ¶ 71; *United States v. Harms*, 442 F.3d 367, 375 (5th Cir.2006) ("If a summary or chart is introduced solely as a pedagogical device, the court should instruct the jury that the chart or summary is not to be considered as evidence, but only as an aid in evaluating evidence.").

**{¶63}** Daniels argues that the chart was a pedagogical device authorized by Evid.R. 611(A). That rule allows the court to exercise reasonable control over the presentation of evidence in order to, among other things, "make the interrogation and presentation effective for the ascertainment of the truth[.]"

**{¶64}** Daniels acknowledges that some courts have declined to treat pedagogical devices as evidence, but cites several federal courts that have allowed pedagogical devices to go into evidence for the jury's consideration. *See, e.g., Bray*, 139 F.3d 1104 at 1111-1112; *United States v. Poschwatta*, 829 F.2d 1477, 1481 (9th Cir. 1987). While we acknowledge those cases, we see no basis for departing from established Ohio precedent on the matter. The court erred by allowing the "harms and losses" chart to go to the jury, and it compounded the error by failing to give a limiting instruction.

IX. Prejudgment Interest

**{¶65}** Vasarhelyi and Koziy offer a ninth assignment of error relating to the imposition of prejudgment interest. However, the errors we have found are sufficient for us to turn to the tenth assigned error and the claim of cumulative error, rendering any ruling on prejudgment interest moot. *See* App.R. 12(A)(1)(c).

## X. Cumulative Error

**{¶66}** "Under the doctrine of cumulative error, 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.'" *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 321, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. As the en banc court holds, the cumulative error doctrine applies in civil cases. *Ante,* at ¶ 6.

**{¶67}** In reviewing the assignments of error, we have identified several trial errors that, standing alone, might not support reversal. Cumulatively, however, those errors are numerous enough that we conclude that Vasarhelyi and Koziy did not receive a fair trial. We therefore vacate the judgment and reverse and remand for a new trial.

## XI. Conclusion

**{¶68}** The fourth, fifth, eighth, and tenth assignments of error are sustained. The second and ninth assignments of error are moot. The remaining assignments of error are overruled.

**{¶69}** Judgment reversed and remanded.

It is ordered that appellants recover of appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MELODY J. STEWART, JUDGE

EILEEN T. GALLAGHER, J., CONCURS IN JUDGMENT ONLY (WITH SEPARATE OPINION);
KATHLEEN ANN KEOUGH, P.J., DISSENTS IN PART AND CONCURS IN JUDGMENT ONLY IN PART (WITH SEPARATE OPINION)

EILEEN T. GALLAGHER, J., CONCURRING IN JUDGMENT ONLY:

{¶70} I concur in judgment only with the majority's decision to vacate the judgment and remand for a new trial based on its determination that appellants did not receive a fair trial. However, I write separately to express my belief that appellants' fourth assignment of error, standing alone, supports reversal for a new trial.

{¶71} In this case, the trial court permitted counsel for Daniels to submit to the jury a medical history report prepared by Jane Heron, R.N. As stated by the lead opinion, however, the medical history summary improperly contained annotations that expressed Heron's personal opinions and the various conclusions or inferences she made upon reviewing Daniels's medical records. Thus, the summary was not an accurate representation of Daniels's medical records, and the trial court erred by admitting the document under Evid.R. 1006.

{¶72} Furthermore, I cannot say the introduction of the medical history summary was harmless. Given the competing theories of the parties in this case, the prejudicial impact of the opinion-based commentary in the summary was significant. Without question, Daniels's medical history, including her previous interaction with belladonna alkaloids, was relevant to the jury's assessment of liability in this medical malpractice case. Because the summary was clearly designed to support Daniels's claims while simultaneously invoking sympathy, I am unable to conclude that the erroneous admission

of the summary "[did] not affect the substantial rights of the complaining party." *O'Brien v. Angley*, 63 Ohio St.2d 159, 407 N.E.2d 490 (1980); Civ.R. 61.

{¶73} Accordingly, I would vacate the judgment exclusively on the grounds set forth in the appellant's fourth assignment of error. I would further find that the remaining assignments of error are moot. I recognize that the unaddressed challenges to the trial court's evidentiary rulings "may or may not be at issue [on remand]." *Nance v. Akron City Hosp.*, 9th Dist. Summit No. 20112, 2001 Ohio App. LEXIS 2278, 11 (May 23, 2001). However, I am equally cognizant that those issues "may be resolved upon different arguments or supplemental evidence." *Id.* Therefore, the resolution of the remaining assignments of error would be advisory in nature, and would not resolve a live controversy. *See Ramadan v. Metrohealth Med. Ctr.*, 8th Dist. Cuyahoga No. 93981, 2011-Ohio-67, ¶ 94, citing App.R. 12(A)(1)(c) ("As an appeals court, however, we will not indulge in advisory opinions.").

{¶74} I am sympathetic to the significant and permanent injuries sustained by Daniels in this matter. To be clear, resolution of the assignments of error is predicated solely on legal precedent, and should not be interpreted as a position on the merits of Daniels's allegations. Regardless of the facts before this court, however, protection of the fundamental and substantial right to a fair trial is paramount. Accordingly, I would sustain appellants' fourth assignment of error, vacate the judgment of the common pleas court, and remand this case for a new trial.

KATHLEEN ANN KEOUGH, P.J., CONCURRING IN JUDGMENT ONLY IN PART; DISSENTING IN PART:

{¶75} I disagree that it is unnecessary to address the defendants' late disclosure of their intent to use the video in the sixth assignment of error, and would find the late disclosure to be a proper basis to exclude the newscast. If defendants had timely disclosed their intent to use the video, Daniels could have called the "hero" doctor as a witness to point out how egregious defendants' errors were. Furthermore, defendants apparently engaged in a pattern of late disclosure — their expert offered new opinions at trial without first disclosing those opinions to Daniels.

{¶76} Nevertheless, I concur that the cumulative effect of the other errors warrants a reversal and a new trial. Accordingly, I dissent in part and concur in judgment only in part.